[No. B174131. Second Dist., Div. One. July 21, 2005.]

MARK R. BELL et al., Plaintiffs and Appellants, v.
BLUE CROSS OF CALIFORNIA, Defendant and Respondent.

**COUNSEL**

Law Offices of Andrew H. Selesnick, Andrew H. Selesnick; California Lawyers Group, Robert B. Scapa; Law Offices of Clifford A. Cantor and Clifford A. Cantor for Plaintiffs and Appellants.

Amy L. Dobberteen, Debra L. Denton, Troy R. Szabo and Jennifer Gore for California Department of Managed Health Care as Amicus Curiae on behalf of Plaintiffs and Appellants.

Catherine I. Hanson and Astrid G. Meghrigian for California Medical Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

Stephan, Oringher, Richman & Theodora, Gordon E. Bosserman and Gerald J. Miller for Defendant and Respondent.

**OPINION**

**VOGEL, J.**—Blue Cross of California is a health care service plan within the meaning of the Knox-Keene Health Care Service Plan Act of 1975, Health and Safety Code section 1340 et seq.[1] Mark R. Bell, M.D. (a board-certified

---

[1] Undesignated section references are to the Health and Safety Code.

emergency room physician who is obligated to treat all emergency room patients without regard to whether they are insured or able to pay (§ 1317, subd. (b)), has not contracted with Blue Cross or otherwise agreed to accept the fees Blue Cross pays to its contracting providers. But Dr. Bell's duty to render emergency services to everyone, including Blue Cross's enrollees, means that Blue Cross is required by statute to "reimburse" Dr. Bell for those services. (§ 1371.4, subd. (b).) "Notwithstanding the statute," claims Dr. Bell, "Blue Cross has a practice of paying non-participating emergency care providers arbitrary amounts that are substantially below the cost, value, and common range of fees for the services . . . the providers render."

To remedy this situation, Dr. Bell filed this class action against Blue Cross, seeking declaratory and injunctive relief, disgorgement, and damages under the unfair competition law (Bus. & Prof. Code, § 17200 et seq. [the UCL]) or, in the alternative, reimbursement for the reasonable value of services rendered (quantum meruit).[2] The gist of Dr. Bell's lawsuit is that section 1371.4 impliedly requires a health plan to pay nonparticipating providers a reasonable and customary amount for emergency services, not "any amount it chooses, no matter how little."[3]

The issue was joined by Blue Cross's demurrer to Dr. Bell's first amended complaint, in which it persuaded the trial court that the Department of Managed Health Care has the exclusive power to enforce the Knox-Keene Act, that Dr. Bell has no standing to pursue either a UCL claim based on section 1371.4 or a common law claim for quantum meruit and that, in any event, emergency room physicians do not have an express or implied right to recover specific amounts (by which it means a "reasonable" amount) for emergency room services rendered to Blue Cross's enrollees. Blue Cross's

---

[2] There are two other named plaintiffs, Max Franklin Lebow, M.D., and Antelope Valley Emergency Medical Associates, Inc., both of whom are included in our references to Dr. Bell. Dr. Bell describes the putative class (consisting of "at least hundreds of members in diverse locations throughout California") as all "emergency physicians or emergency physician groups whom [Blue Cross] paid, no earlier than May 15, 1999, for emergency medical care rendered to [Blue Cross's] enrollees (other than enrollees who were covered by an ERISA-regulated plan) under circumstances in which the provider was non-participating with [Blue Cross]."

[3] According to Dr. Bell, this is the difference between participating and nonparticipating providers: "Some doctors . . . enter into express written contracts with Blue Cross to accept reduced payment for medical services in exchange for an anticipated increase in volume of business associated with being a Blue Cross 'participating' provider. [¶] For participating providers, the amount that the provider will accept from Blue Cross to discharge a bill is predetermined by the express written contract between the provider and Blue Cross. The plan enrollee is responsible only for the applicable deductible (if any) and coinsurance. The provider's express written contract forbids the provider from . . . billing the patient more than the reduced fee that the provider agreed to accept. [¶] Other doctors and medical providers do not enter into such express written contracts with Blue Cross and are therefore considered 'non-participating' providers."

demurrer was sustained without leave to amend, and the case is now before us on Dr. Bell's appeal from the judgment of dismissal thereafter entered.

We agree with the Department of Managed Health Care (amicus curiae on this appeal, as is the California Medical Association) that the Knox-Keene Act leaves Dr. Bell free to pursue alternate theories to recover the reasonable value of his services, that Dr. Bell's claim under the UCL does not infringe on the Department's jurisdiction, that there is no bar to Dr. Bell's common law quantum meruit claim, and that Blue Cross's obligation to reimburse includes an obligation to do so reasonably. We reverse.

## DISCUSSION

### A.

The Knox-Keene Act is a comprehensive system of licensing and regulation under the jurisdiction of the Department of Managed Health Care. (*California Medical Assn. v. Aetna U.S. Healthcare of California, Inc.* (2001) 94 Cal.App.4th 151, 155, fn. 3 [114 Cal.Rptr.2d 109].) Among many other things, the Act compels for-profit health care service plans to reimburse emergency health care providers for emergency services to the plans' enrollees. (§§ 1371 [a health care service plan must "reimburse claims . . . as soon as practical, but no later than 30 working days after receipt of the claim . . . unless the claim or portion thereof is contested by the plan"], 1371.35, subd. (a).) More specifically, section 1371.4 provides that a for-profit "health care service plan shall reimburse providers for emergency services and care provided to its enrollees, until the care results in stabilization of the enrollee, except as provided in subdivision (c). As long as federal or state law requires that emergency services and care be provided without first questioning the patient's ability to pay, a health care service plan shall not require a provider to obtain authorization prior to the provision of emergency services and care necessary to stabilize the enrollee's emergency medical condition." (§ 1371.4, subd. (b); see § 1371.4, subd. (f).) "Payment for emergency services and care may be denied only if the health care service plan reasonably determines that the emergency services and care were never performed . . . ." (§ 1371.4, subd. (c); see § 1371.4, subd. (f); and see Cal. Code Regs., tit. 28, § 1300.71, subd. (a).) Federal and state law both require that emergency services must be provided without first questioning the patient's ability to pay.[4]

---

[4] "Emergency services and care shall be provided to any person requesting the services or care, or for whom services or care is requested, for any condition in which the person is in danger of loss of life, or serious injury or illness, at any health facility licensed under this chapter that maintains and operates an emergency department to provide emergency services to the public . . . . [¶] . . . In no event shall the provision of emergency services and care be based upon, or affected by, the person's race, ethnicity, religion, national origin, citizenship, age, sex,

Under the Department of Managed Health Care's regulations, "reimbursement of a claim" for noncontract providers means health care service plans must pay "the reasonable and customary value for the health care services rendered based upon statistically credible information that is updated at least annually and takes into consideration: (i) the provider's training, qualifications, and length of time in practice; (ii) the nature of the services provided; (iii) the fees usually charged by the provider; (iv) prevailing provider rates charged in the general geographic area in which the services were rendered; (v) other aspects of the economics of the medical provider's practice that are relevant; and (vi) any unusual circumstances in the case . . . ." (Cal. Code Regs., tit. 28, § 1300.71, subd. (a)(3).)[5]

## B.

■ Subdivision (b) of section 1371.4 was enacted in 1994 to impose a mandatory duty upon health care plans to reimburse noncontracting providers for emergency medical services. (Stats. 1994, ch. 614, § 4, p. 3012; Sen. Bill No. 1832 (1993–1994 Reg. Sess.); *California Emergency Physicians Medical Group v. PacifiCare of California* (2003) 111 Cal.App.4th 1127, 1131 [4 Cal.Rptr.3d 583]; *Ochs v. PacifiCare of California* (2004) 115 Cal.App.4th 782, 790 [9 Cal.Rptr.3d 734].) Although the Department of Managed Health Care has jurisdiction over the subject matter of section 1371.4 (as well as the rest of the Knox-Keene Act), its jurisdiction is not exclusive and there is nothing in section 1371.4 or in the Act generally to preclude a private action under the UCL or at common law on a quantum meruit theory. (*Coast Plaza Doctors Hospital v. UHP Healthcare* (2002) 105 Cal.App.4th 693, 706–707 [129 Cal.Rptr.2d 650] [the Knox-Keene Act itself contemplates that a health care plan may be held liable under theories based on other laws, and a

preexisting medical condition, physical or medical handicap, insurance status, economic status, or ability to pay for medical services . . . . [¶] . . . [¶] . . . Emergency services and care shall be rendered without first questioning the patient or any other person as to his or her ability to pay therefor. However, the patient or his or her legally responsible relative or guardian shall execute an agreement to pay therefor or otherwise supply insurance or credit information promptly after the services are rendered." (§ 1317, subds. (a), (b), (d); see also 42 U.S.C. § 1395dd(d); and for the scope of such services, see §§ 1317.1, subds. (a)(1), (2), (b), 1371.4, subd. (i).)

[5] This regulation, which was adopted after Dr. Bell filed his original complaint but before he filed his first amended complaint, allegedly expresses the Department's "long-standing" position and was not intended to change the law. (Cf. *Gould v. Workers' Comp. Appeals Bd.* (1992) 4 Cal.App.4th 1059 [6 Cal.Rptr.2d 228].) On this appeal from a demurrer dismissal, we must of course treat these allegations as true. (*Canton Poultry & Deli, Inc. v. Stockwell, Harris, Widom & Woolverton* (2003) 109 Cal.App.4th 1219, 1225 [135 Cal.Rptr.2d 695].) In any event, Blue Cross concedes that, assuming standing, the regulations apply in this case. For the record, we emphasize that our reference to the regulation is just that, and does not constitute a finding that the regulation is the sine qua non of the ultimate issue in this case—which is not before us on this appeal.

provider has standing to pursue claims under the UCL and the common law]; *California Emergency Physicians Medical Group v. PacifiCare of California, supra,* 111 Cal.App.4th at p. 1134; *In re Managed Care Litigation* (2003) 298 F.Supp.2d 1259, 1301–1302; §§ 1371.25, 1371.37.)[6]

The case relied on by the trial court, *Samura v. Kaiser Foundation Health Plan, Inc.* (1993) 17 Cal.App.4th 1284 [22 Cal.Rptr.2d 20] (where Division One of the First District held that a contracting physician could not sue his nonprofit health maintenance organization under the UCL) is inapposite. First, *Samura* was decided before sections 1371.4 (1994), 1371.25 (1995), and 1371.37 (2000) were enacted and the case has nothing to do with section 1371.4 or a provider's standing under that section as explained in *Coast Plaza* and *California Emergency.*[7] Second, *Samura* does not in any event purport to give the Department of Managed Health Care exclusive jurisdiction to enforce every section of the Knox-Keene Act, but simply limits a contracting provider's suit for injunctive relief to "acts which are made unlawful by the Knox-Keene Act." (*Samura v. Kaiser Foundation Health Plan, Inc., supra,* 17 Cal.App.4th at p. 1299.)

## C.

Any doubt about Dr. Bell's standing dissolves in light of the Department of Managed Health Care's support of private enforcement.[8] An uncontroverted record establishes (1) that the Department "has consistently taken the position that a provider is free to seek redress in a court of law if he disputes a health plan's determination of the reasonable and customary value of covered

---

[6] We summarily reject Blue Cross's suggestion that these cases do not apply here. In *Coast Plaza Doctors Hospital v. UHP Healthcare, supra,* 105 Cal.App.4th at page 696, Division Four of our court held that the Knox-Keene Act does not bar a noncontracting emergency services provider from seeking direct compensation on a common law breach of (implied) contract theory or under the UCL. In *California Emergency Physicians Medical Group v. PacifiCare of California, supra,* 111 Cal.App.4th 1127, Division One of the Fourth District held that a health care service plan had permissibly delegated certain responsibilities and thus was not liable to a group of contracting emergency care providers, but made it clear that the providers had standing to sue the plan, provided only that their claims were not "contrary to a specific provision of the Knox-Keene Act." (*Id.* at p. 1134.)

[7] Section 1371.25 makes health care service plans and providers each responsible for their own acts and omissions, and confirms the rule that both can be liable "on the doctrines of equitable indemnity, comparative negligence, contribution, or other statutory or common law bases for liability." Section 1371.37 prohibits plans from engaging in unfair payment patterns and gives the Department of Managed Health Care permissive (but not exclusive) investigative and enforcement authority vis-à-vis such practices.

[8] The construction of a statute by the executive department charged with its administration is entitled to great weight and substantial deference. (*In re Karla C.* (2003) 113 Cal.App.4th 166, 175 [6 Cal.Rptr.3d 205]; *Harrott v. County of Kings* (2001) 25 Cal.4th 1138, 1154–1155 [108 Cal.Rptr.2d 445, 25 P.3d 649].)

services as required by section 1371.4," (2) that "providers are free to pursue alternate theories of recovery to secure the reasonable value of their services based on common law theories of breach of contract and *quantum meruit*," and (3) that a "provider's private action for reimbursement under the . . . UCL does not infringe upon the Department's jurisdiction over the Knox-Keene Act."

In the Department's words, "[t]he fundamental flaw in the trial court's ruling is that it allows a health plan to unilaterally determine the level of reimbursement for non-contracted emergency providers without further recourse which can lead to the payment of less than the reasonable and customary value of the providers' services. If providers are precluded from bringing private causes of action to challenge health plans' reimbursement determinations, health plans may receive an unjust windfall and patients may suffer an economic hardship when providers resort to balance billing activities to collect the difference between the health plan's payment and the provider's billed charges. If collection actions are pursued, unsuspecting enrollees can be forced to reimburse the full amount of a provider's billed charges even though those charges are in excess of the reasonable and customary value of the services rendered.

"The prompt and appropriate reimbursement of emergency providers ensures the continued financial viability of California's health care delivery system. The trial court's decision, denying emergency providers judicial recourse to challenge the fairness of a health plan's reimbursement determination, allows a health plan to systemically underpay California's safety-net providers and unnecessarily involve[s] the patient[s] in billing disputes between the provider and their health plan[s]. [¶] . . . The Department, unlike the courts, lacks the authority to set specific reimbursement rates under theories of *quantum meruit* and the jurisdiction to enforce a reimbursement determination on both the provider and the health plan. Because the Department cannot provide an adequate forum, health care providers must be allowed to maintain a cause of action in court to resolve individual claims-payment disputes over the reasonable value of their services."

In short, it is the Department's view that Dr. Bell has standing under the UCL to pursue his allegations that Blue Cross has violated section 1371.4, and standing to pursue his common law claim of quantum meruit for a fair and reasonable reimbursement based on the implied-in-law contract created by Dr. Bell's statutory duty to provide stabilizing medical care, and Blue Cross's concomitant statutory duty to pay for emergency services rendered to its enrollees.

## D.

To avoid these conclusions, Blue Cross claims the legislative history of section 1371.4—the enactment of which Blue Cross opposed—compels a different result, and that section 1371.4 merely establishes "guidelines for the time and manner of payment of emergency charges." We disagree.

### 1.

Although section 1371.35 sets out the time and manner for the reimbursement of claims, there are no such requirements in section 1371.4, the statute imposing the duty to reimburse (and the statute directly at issue in this case). The trial court's order nevertheless states that section 1371.4 "does not purport to regulate the amount of reimbursement, only the time and manner of reimbursement." To support this finding, Blue Cross contends that, assuming "some nebulous equitable notion of 'fair' compensation" is applied, the amount paid to noncontracting providers "should be determined primarily based on the contract between Blue Cross and its subscribers . . . ." Beyond that, Blue Cross insists that "a system whereby non-contracting providers would be compensated at a higher rate than contracting providers [would destroy] any incentive for emergency providers to contract with a health plan like Blue Cross," with a net result of "higher premiums for subscribers based on the higher cost of non-contracted emergency provider services . . . ." However concerned we may be about spiraling costs for health care service plans and their enrollees, those concerns cannot justify a rule that would single out emergency care physicians and force them to work for something other than a reasonable fee.

### 2.

Section 1371.4 originated as Senate Bill No. 1832, which was introduced at the request of the California Medical Association and supported by (among others) the California Chapter of the American College of Emergency Physicians, and was originally drafted to "require plans to reimburse physicians for emergency services and care up to the point of stabilization, and at rates no less than Medicare reimbursement levels." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1832 (1993–1994 Reg. Sess.) as amended May 17, 1994, p. 6.) Blue Cross opposed the bill precisely because it " 'would [have] require[d] plans to pay for emergency services and care at no less than the Medicare reimbursement rate,' " which Blue Cross said was inconsistent with its efforts to control costs "through negotiated fees with providers." (Id., p. 6.) Blue Cross prevailed, the Medicare floor was deleted, and, the statute as enacted simply provides that a "health care service

plan shall reimburse providers for emergency services and care provided to its enrollees." (§ 1371.4, subd. (b).)

■ Because the statute does not tie reimbursement to Medicare, Blue Cross now claims it is free to reimburse emergency care providers at whatever rate it unilaterally and arbitrarily selects. According to Blue Cross, "it is clear that the Legislature was using the term 'reimbursement' in its generic sense, i.e. as a synonym for 'payment,' and not, as [Dr. Bell claims], as a requirement that the payment be 'reasonable' or otherwise tied to a specific amount." Although we agree that Blue Cross's reimbursement obligation is not tied to a specific amount (Medicare or anything else), we do not agree that Blue Cross has unfettered discretion to determine unilaterally the amount it will reimburse a noncontracting provider, without any regard to the reasonableness of the fee. (*In re Howard N.* (2005) 35 Cal.4th 117 [24 Cal.Rptr.3d 866, 106 P.3d 305]; *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 743–744 [110 Cal.Rptr.2d 828, 28 P.3d 876] [a part of a statute must be harmonized within its statutory framework, and must be construed to " 'result in wise policy rather than mischief or absurdity' "]; *Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 923–924 [129 Cal.Rptr.2d 811, 62 P.3d 54].)

Two additional reasons compel this result.

■ First, the health care plans' duty to reimburse arises out of the providers' duty to render services without regard to a patient's insurance status or ability to pay. Because Blue Cross's interpretation of "reimburse" would render illusory the protection the Legislature granted to the providers, the duty to reimburse must be read as a duty to pay a reasonable and customary amount for the services rendered. (Cf. *Stevenson v. San Francisco Housing Authority* (1994) 24 Cal.App.4th 269, 283 [29 Cal.Rptr.2d 398]; *Stoneson Development Corp. v. Superior Court* (1987) 197 Cal.App.3d 178, 180 [242 Cal.Rptr. 721].)

Second, Blue Cross's interpretation would mean the emergency care providers could be reimbursed at a confiscatory rate that, aside from being unconscionable, would be unconstitutional. (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 252 [127 Cal.Rptr.2d 177, 57 P.3d 654] [a statute should be interpreted to avoid constitutional difficulties]; *Cunningham v. Superior Court* (1986) 177 Cal.App.3d 336, 348 [222 Cal.Rptr. 854] [a professional cannot be forced to give away a portion of his livelihood]; *California Gillnetters Assn. v. Department of Fish & Game* (1995) 39 Cal.App.4th 1145, 1156 [46 Cal.Rptr.2d 338].) In short, the statute must be read to require reasonable reimbursement.

## E.

In its demurrer, Blue Cross challenged both Dr. Bell's standing and the merits of his claims (1) that he has a right (implied by law) to recover a reasonable amount for emergency services rendered to Blue Cross enrollees and (2) that he has a right to pursue his UCL claim. On this appeal, Blue Cross contends that, assuming Dr. Bell's standing, its demurrer was nevertheless properly sustained because Dr. Bell's first amended complaint fails to state a cause of action.

We reject Blue Cross's contention that Dr. Bell has no implied-in-law right to recover for the reasonable value of his services. "He who takes the benefit must bear the burden" (Civ. Code, § 3521), and he who has "performed the duty of another by supplying a third person with necessaries, although acting without the other's knowledge or consent, is entitled to restitution from the other therefor if [¶] (a) he acted unofficiously and with intent to charge therefor, and [¶] (b) the things or services supplied were immediately necessary to prevent serious bodily harm to or suffering by such person." (Rest., Restitution, § 114 (1937), quoted in *California Emergency Physicians Medical Group v. PacifiCare of California, supra,* 111 Cal.App.4th at p. 1137, fn. 3.) Dr. Bell's quantum meruit claim is sufficient for pleading purposes and thus is not subject to demurrer.

We likewise reject Blue Cross's contention that Dr. Bell has failed to state a cause of action under the UCL, where the issue is whether Dr. Bell's first amended complaint alleges that Blue Cross engaged in a business practice likely to deceive the reasonable person to whom the practice was directed, not whether there was actual deception. (*South Bay Chevrolet v. General Motors Acceptance Corp.* (1999) 72 Cal.App.4th 861, 878, 883, fn. 18 [85 Cal.Rptr.2d 301]; *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1267 [10 Cal.Rptr.2d 538, 833 P.2d 545]; *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 211 [197 Cal.Rptr. 783, 673 P.2d 660].) For pleading purposes, Dr. Bell's complaint (including his declaratory relief cause of action) is more than adequate.[9]

---

[9] To the extent Blue Cross contends the UCL claim fails because there must be an allegation that an act violated a specific statute (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 185 [83 Cal.Rptr.2d 548, 973 P.2d 527]), our rejection of Blue Cross's challenge to Dr. Bell's standing allows Dr. Bell to sue for a violation of section 1371.4 under the UCL.

## F.

Dr. Bell and the California Medical Association tell us that, "[f]or countless Californians, emergency departments are the difference between life and death and are the most important component of our State's health care 'safety net.' Over 10 million people visit emergency departments in California each year, according to the California Chapter of the American College of Emergency Physicians." They claim that "Blue Cross's underpayments have had the effect of destabilizing emergency departments statewide. When Blue Cross does not pay its fair share for emergency physician services, all Californians suffer. With less money, emergency departments close or become short-staffed, resulting in long patient waits and overcrowding; prolonged patient pain and suffering; patient dissatisfaction; and sometimes even violence in the emergency department. While the number of people seeking care at emergency departments has increased, between 1988 and 1998 over 1,100 emergency departments closed nationwide. During that same period, 12 [percent] of California emergency departments closed; in 1999 and 2000, another nine emergency departments were shuttered."

Blue Cross has a different perspective, and insists that Dr. Bell and the California Medical Association are ignoring "the broader and harmful consequences of their respective positions on the system of managed health care in California and, in particular, the ability of health plans to serve the public interest by negotiating contracts with providers and thereby holding down the cost of health care in this State." According to Blue Cross, "[o]ne significant way managed care companies control costs is through negotiated fees with providers. Plans will be discouraged from negotiating lower provider fees, fees which save their members money through lower premiums and lower co-payments, if they are bound to reimburse providers at a specified level. In addition, there would be no incentive for members to seek treatment in the less costly office setting in cases where emergency treatment is not necessary, since they will know payment in an emergency room is guaranteed." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1832 (1993–1994 Reg. Sess.) as amended May 17, 1994, p. 6.)

For our part, we reject the parties' suggestion that we can solve the societal and economic problems defined by their rhetoric, and emphasize that our decision is limited to the precise issue before us—that the obligation to "reimburse" imposed by section 1371.4. is to reimburse a reasonable sum, the definition of which will be adjudicated by Dr. Bell's prosecution of this lawsuit against Blue Cross.

## DISPOSITION

The judgment is reversed and the cause is remanded to the trial court with directions (1) to vacate its order sustaining Blue Cross's demurrer, (2) to enter a new order overruling the demurrer and fixing the time within which Blue Cross may answer the first amended complaint, and (3) placing the case on track for trial. Dr. Bell is awarded his costs of appeal.

Spencer, P. J., and Rothschild, J., concurred.

Respondent's petition for review by the Supreme Court was denied October 26, 2005.