Filed 10/20/25  Prime Healthcare Centinela v. United Healthcare Ins. Co. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| PRIME HEALTHCARE CENTINELA, LLC et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> UNITED HEALTHCARE INSURANCE COMPANY, <br><br> Defendant and Respondent. | B334746 <br><br> (Los Angeles County Super. Ct. No. 22STCV08452) |

APPEAL from an order of the Superior Court of Los Angeles County, Lawrence P. Riff, Judge.  Affirmed.

Buchalter, Damaris L. Medina, Devan J. McCarty, Robert M. Dato, Efrat M. Cogan and Karen N. George for Plaintiffs and Appellants.

Crowell & Moring, Nathaniel J. Wood, Marlee J. Godinho Santos; Gibson, Dunn & Crutcher, Kahn A. Scolnick, Matt A. Getz, and Allison R. Kawachi for Defendant and Respondent.

\* \* \* \* \* \*

Hospitals that "operate[] an emergency department" open "to the public" are obligated—under federal and state law—to provide emergency services to anyone who is "in danger of loss of life, or serious injury or illness." (Health & Saf. Code, § 1317, subd. (a); 42 U.S.C. § 1395dd(b).)  The portion of the Health and Safety Code enacted as the Knox-Keene Health Care Service Plan Act of 1975 (Health & Saf. Code, § 1340 et seq.) (the Knox-Keene Act) explicitly imposes a duty upon "health care service plan[s]," which are regulated by the Department of Managed Health Care (DMHC), to directly "reimburse" hospitals who are outside of the plans' contracted network for their provision of such services at their "reasonable and customary value." (*Id.*, § 1371.4, subd. (b); Cal. Code Regs., tit. 28, § 1300.71, subd. (a)(3); *Bell v. Blue Cross of California* (2005) 131 Cal.App.4th 211, 215-216 (*Bell*).)  Does a similar duty to directly reimburse out-of-network hospitals for the reasonable and customary value of any emergency services they provide exist for health insurance companies regulated by the Department of Insurance?  We hold that it does not:  The Insurance Code does not explicitly impose such a duty and the canons of statutory construction counsel against *inferring* such a duty from other provisions of the Insurance Code or their legislative history, by analogy to the Knox-Keene Act, or from the common law.  Because the question whether insurance companies *should* have a duty to directly reimburse for such

2

services is one of public policy, it is a question for the Legislature and not this court. We must accordingly affirm the trial court's judgment dismissing the claims of several hospitals against an insurance company premised upon the existence of that duty.

**FACTS AND PROCEDURAL BACKGROUND**

## I. Facts

Prime Healthcare (Prime) operates hospitals throughout Southern California, including in Chino Valley, Huntington Beach, Sherman Oaks, and Anaheim (collectively, the hospitals); each has an emergency department.[1] Since January 1, 2020, these hospitals have provided emergency services to patients who have health insurance with United Healthcare Insurance Company, Inc. (United) or who are members of the UHC of California, Inc. health insurance service plan (UHC), even though the hospitals are not part of United or UHC's network of providers. United and UHC have "ma[de] payments" to Prime "on a large number of claims," but in what Prime views as "inadequate amounts."

## II. Procedural Background

### A. *Complaint*

On March 9, 2022, Prime sued United and UHC for (1) quantum meruit, (2) open book account, and (3) violation of California's Unfair Competition Law (Bus. & Prof. Code, § 17200

---

1       The corporate names of the five hospitals are (1) Prime Healthcare Centinela, LLC, dba Centinela Hospital Medical Center; (2) Veritas Health Services, Inc., dba Chino Valley Medical Center; (3) Prime Healthcare Huntington Beach, LLC, dba Huntington Beach Hospital; (4) Prime Healthcare Services – Sherman Oaks, LLC, dba Sherman Oaks Hospital; and (5) Prime Healthcare Anaheim, LLC, dba West Anaheim Medical Center.

et seq.) (UCL).[2] All of these claims are premised on United's and UHC's alleged failure to "pay the *reasonable* value of emergency medical services provided" by the hospitals. (Italics added.)

### B. *United's demurrer*

United—but not UHC—demurred, arguing that it owed no duty to directly reimburse Prime the reasonable value of the emergency services its hospitals provided.[3] After fulsome briefing and two hearings, the trial court issued a 13-page order sustaining the demurrer without leave to amend. The court reasoned that the Insurance Code that regulates health insurance companies like United does not explicitly obligate insurers to directly reimburse the out-of-network providers of emergency services, and the court refused to infer such an obligation from the Insurance Code's obligation that insurers "cover emergency services" in their policies because "an insurer's statutory duty to provide insurance *coverage to insureds* does not necessarily imply a duty to *reimburse providers* the reasonable and customary value of the providers' services." (Italics in original.) The court also rejected Prime's proffered analogy to the Knox-Keene Act because the Insurance Code "lacks the express statutory duty to reimburse" providers that exists in the Knox-Keene Act. (Italics omitted.) Because no statute mandated direct

---

2       Although Prime also asserted a separate claim for "services rendered," that claim is substantively duplicative of its equitable claim for quantum meruit. (See *Port Medical Wellness, Inc. v. Connecticut General Life Ins. Co.* (2018) 24 Cal.App.5th 153, 180.) We accordingly do not separately discuss it.

3       United also argued that the claims were barred by the doctrine of collateral estoppel, but the trial court rejected that argument and the parties do not renew it on appeal.

4

reimbursement at a reasonable rate, the fundamental premise of all of Prime's claims was absent and necessitated dismissal.[4]

### C. *Appeal*

Following entry of an order dismissing United from the action, Prime filed this timely appeal.

## DISCUSSION

All of Prime's claims against United have the same underlying premise—namely, that United has a duty to directly reimburse Prime for the "customary and reasonable" value of the emergency services that Prime's hospitals provided to United's insureds.[5] In reviewing the trial court's order dismissing these claims on demurrer, "'we accept the truth of material facts properly pleaded in the operative complaint, but not contentions, deductions, or conclusions of fact or law.'" (*Capito v. San Jose Healthcare System, LP* (2024) 17 Cal.5th 273, 280; *Ranger v.*

---

[4] In addition to finding that this overarching premise of Prime's complaint failed, the trial court also explained why each of Prime's claims failed as to certain required elements. Because our holding does not depend on the specific elements of each of Prime's claims, we need not discuss this further rationale by the trial court.

[5] Although Prime's UCL claim was phrased in terms of United's conduct being "unfair" as well as "unlawful," and although those two prongs *can* be distinct (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180), Prime did not treat them as distinct in its complaint, alleging that United's conduct was unfair because "it prevents the laws relating to services for emergency services and payment from protecting emergency providers and patients, as intended," which is alleged to have the effect of discouraging higher payments to those providers.

5

*Alamitos Bay Yacht Club* (2025) 17 Cal.5th 532, 538.) "Because this appeal was taken from a dismissal on demurrer, and involves questions of statutory interpretation, our review is de novo." (*Stone v. Alameda Health System* (2024) 16 Cal.5th 1040, 1052 (*Stone*).) Because Prime offers no argument that it should be entitled to amend its complaint, we focus solely on the viability of Prime's claims as alleged.

## I. Pertinent Health Care Law

A health insurance company is obligated to pay the health care costs of its insured in accordance with the terms of the health insurance policy between them. (Ins. Code, §§ 10111, 106, subd. (b) [defining "health insurance" as a species of "disability insurance policy"].)[6] The insurance company often enters into contracts with providers of medical services, who become part of the insurance company's preferred "network" of providers and who can seek compensation for services rendered to insured patients from the insurance company at the agreed-upon, contractual rate. Sometimes, the insurance company and the provider of medical services are one and the same; in California, such a hybrid is officially called a "health care service plan" (Health & Saf. Code, § 1345, subd. (f)(1)) but is more "commonly known" as an HMO (health maintenance organization) (*Centinela Freeman Emergency Medical Associates v. Health Net of California, Inc.* (2016) 1 Cal.5th 994, 1000-1001, fn. 2 (*Centinela*); *Prospect Medical Group, Inc. v. Northridge Emergency Medical Group* (2009) 45 Cal.4th 497, 501-502 (*Prospect*)). While health insurance companies and health care service plans perform similar functions, health insurance companies are regulated by

---

[6] All further statutory references are to the Insurance Code unless otherwise indicated.

the Insurance Code and overseen by the Department of Insurance (*Rea v. Blue Shield of California* (2014) 226 Cal.App.4th 1209, 1215), while health care service plans are regulated by the Knox-Keene Act and overseen by the DMHC (Health & Saf. Code, § 1341, subd. (a); *County of Santa Clara v. Superior Court* (2023) 14 Cal.5th 1034, 1041 (*Santa Clara*)).

Although insureds under a health insurance policy and enrollees in a health care service plan typically use the providers of medical services within the company's or plan's network (so-called "in-network providers"), this model "breaks down . . . in the case of emergency care" because, in such emergencies, a patient is likely to go "to the nearest hospital emergency room for treatment" regardless of whether it is an in-network or out-of-network provider. (*Prospect*, *supra*, 45 Cal.4th at p. 501.) Recognizing this reality, federal and state law obligate the providers of "emergency services"[7] to treat patients regardless of whether they are in- or out-of-network, regardless of their insurance status, and regardless of their ability to pay for medical services. (42 U.S.C. § 1395dd(b); Health & Saf. Code, § 1317, subds. (a) & (b); *Santa Clara*, *supra*, 14 Cal.5th at p. 1037.)

---

[7] "Emergency services and care" is defined as "medical screening, examination, and evaluation by a physician and surgeon, or, to the extent permitted by applicable law, by other appropriate licensed persons under the supervision of a physician and surgeon, to determine if an emergency medical condition or active labor exists and, if it does, the care, treatment, and surgery, if within the scope of that person's license, necessary to relieve or eliminate the emergency medical condition, within the capability of the facility." (Health & Saf. Code, § 1317.1, subd. (a)(1).)

7

The Knox-Keene Act imposes a duty upon health care service plans to (1) cover "emergency services" provided by in-network and out-of-network providers as to plans that otherwise "cover[] hospital, medical or surgical expenses" (Health & Saf. Code, § 1371.4, subd. (a)), and (2) directly "reimburse [medical] providers for emergency services and care provided to its enrollees" "necessary to stabilize the enrollee's emergency medical condition" (*id.*, subd. (b); *Santa Clara*, *supra*, 14 Cal.5th at pp. 1037-1038).  The Knox-Keene Act further delineates the scope of the duty to reimburse:  If the emergency services provider is "in-network," the plan must directly pay the provider the "agreed upon" contractual rate (Cal. Code Regs., tit. 28, § 1300.71, subd. (a)(3)(A)); if the emergency services provider is out-of-network, the plan must directly pay the provider the "reasonable and customary value for the [emergency] health care services rendered" (*id.*, subd. (a)(3)(B); *Santa Clara*, at p. 1042), and "reasonable and customary value" is defined by a nonexclusive list of factors (Cal. Code Regs., tit. 28, § 1300.71, subd. (a)(3)(B); *Children's Hospital Central California v. Blue Cross of California* (2014) 226 Cal.App.4th 1260, 1265, 1271).  A provider may sue the plan in quantum meruit for any perceived shortfall (*Bell*, *supra*, 131 Cal.App.4th at pp. 213-215; *Prospect*, *supra*, 45 Cal.4th at p. 505), but may *not* pursue the plan's enrollee for the shortfall (which, in the vernacular, is called "balance billing" because the provider is seeking to recover from the enrollee the balance of the bill owed) (*Prospect*, at pp. 501-502, 507).[8]

---

[8]      A plan may delegate its duty to reimburse providers under the Knox-Keene Act to an intermediary (§ 1371.4, subd. (e)), thereby absolving itself of liability unless it negligently selects or

The Insurance Code's provisions are different than the Knox-Keene Act's. Somewhat akin to the Knox-Keene Act, the Insurance Code explicitly imposes a duty upon health insurance companies whose policies "provide[] or cover[] any benefits with respect to services in an emergency department of a hospital [to] cover" those services without "prior authorization"; to do so regardless of whether the provider is in- or out-of-network; and if the provider is out-of-network, to do so at the same level of service and copayment as if it were in-network. (§ 10112.7, subd. (a).) But, unlike the Knox-Keene Act, the Insurance Code does not explicitly impose any duty upon insurance companies to directly reimburse providers of emergency services and the courts have not barred "balance billing" by providers to insureds.

## II. Analysis

The question presented by Prime's appeal is whether health insurance companies have a duty, under the Insurance Code, to directly reimburse out-of-network providers for emergency services provided to company's insureds at the "reasonable and customary" value of those services. This is a question of statutory interpretation, and is accordingly guided by the pertinent canons: We start with the statute's text and, if it is clear, stop with the text (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 737); if the text is unclear, we may look to the statute's legislative history (*Stone, supra*, 16 Cal.5th at p. 1052).

Prime concedes that the Insurance Code nowhere explicitly imposes a duty upon health insurers to directly reimburse out-of-

maintains that intermediary (*Ochs v. PacifiCare of California* (2004) 115 Cal.App.4th 782, 787; *Centinela, supra*, 1 Cal.5th at pp. 1001-1002).

9

network providers for emergency services at the "reasonable and customary" value for those services. Prime nevertheless offers what boil down to five reasons why we should *infer* such a duty.

First, Prime argues that a duty arises from what it characterizes as "two inter-related mandates" of the Insurance Code—namely, (1) the mandate that "insurers must reimburse providers for all covered services," as Prime claims is set forth in section 10123.147, and (2) the mandate that "insurers must cover [out-of-network] emergency services," as set forth in section 10112.7. (Italics omitted.) "These two express mandates read together," Prime asserts syllogistically, "create the rule [that] insurers must reimburse [out-of-network] providers for non-contracted emergency services." (Emphasis omitted.)

We reject this argument because its two steps each rest on a misreading or an overreading of the provisions Prime cites.

To begin, section 10123.147 does not proclaim a substantive entitlement to reimbursement. Contrary to Prime's out-of-context quoting of section 10123.147, the statute actually states that "[e]very insurer issuing group or individual policies of health insurance that cover hospital, medical, or surgical expenses . . . shall reimburse each complete claim" subject to timelines and procedures set forth in that statute. (§ 10123.147, subd. (a).) The Knox-Keene Act has parallel provisions that also lay out timelines and procedures for reimbursement. (Health & Saf. Code, §§ 1371.35, 1371.) If, as Prime contends, provisions detailing the timelines and procedures to be followed for reimbursement automatically create a substantive duty to directly reimburse out-of-network providers for *every service provided*, all of the provisions in the Knox-Keene Act and the Insurance Code explicitly imposing a duty of direct

10

reimbursement would be superfluous (§ 10120.35, subd. (b) [duty to "reimburse" for expenses related to preventing the spread of disease]; § 10126.66, subd. (d) [duty to "reimburse" ambulance provider]; Health & Saf. Code, § 1371.4, subd. (b) [duty to "reimburse providers"]; *id.*, § 1342.2, subd. (b) [duty to "reimburse" for COVID-19 diagnostic and screening testing]); we decline to nullify broad swaths of those Codes.  Nor must we construe section 10123.147 to create such a substantive duty in order to give it purpose:  As our Legislature has noted in a statement of intent accompanying section 10123.147, that section provides the procedural blueprint for *anyone* entitled to reimbursement, which would include the insured and in-network providers, to seek reimbursement for medical expenses.  (Stats. 2005, ch. 723, § 1(b); *California Housing Finance Agency v. Elliott* (1976) 17 Cal.3d 575, 583 [legislative findings entitled to "great weight"].)  Thus, the existence of section 10123.147 does not necessarily imply an entitlement *by out-of-network providers* to reimbursement.  Put succinctly, the fact that section 10123.147 uses the word "reimburse" in its procedural context does not create a global substantive right to direct reimbursement for all expenses to everyone.  Prime resists our analysis, citing cases decrying the use of the labels "procedural" and "substantive" being given dispositive weight (*Vaughn v. LJ Internat., Inc.* (2009) 174 Cal.App.4th 213, 220; *Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1238, fn. 2); but those cases frankly acknowledge that statutes that have the *effect* of being procedural rather than substantive are to be treated differently (*Evangelatos*, at p. 1238, fn. 2), and that is the statutory scheme here.  (Accord, *California Medical Assn. v. Aetna U.S. Healthcare of California, Inc.* (2001) 94 Cal.App.4th 151, 163 [procedural

11

provision in Health and Safety Code section 1371 did not "impose an[y substantive] obligation on health plans"].)

Nor can we infer a duty to directly reimburse out-of-network providers from the duty to "cover" emergency services provided by such providers. Although, as noted above, section 10112.7 obligates a health insurance company to "cover" emergency services provided by an out-of-network provider if the policy already covers emergency services provided by an in-network provider, *covering those services* and *directly reimbursing the provider of those services* are not synonymous. To illustrate, the Knox-Keene Act imposes a duty to cover and a duty to directly reimburse a provider in separate statutory provisions in several instances, including with respect to the emergency services at issue here. (Compare Health & Saf. Code, § 1371.4. subd. (a) [duty to cover "emergency services"] with *id.*, subd. (b) [duty to "reimburse providers"]); compare *id.*, § 1342.2, subd. (a) [duty to "cover the costs for COVID-19 diagnostic and screening testing"] with *id.*, subd. (a)(4) [duty to "reimburse the provider"].) The Insurance Code also sets forth the two duties in separate statutes as to certain services. (Compare § 10110.7, subd. (b) [duty to "cover the costs for COVID-19 diagnostic and screening testing and [related] health care services"] with *id.*, subd. (b)(1) [duty to "reimburse the health care provider"].) If the duty to cover necessarily included the duty to directly reimburse providers, the provisions imposing the latter duty would be mere surplusage—and we are not to construe statutory provisions to be surplusage. (*Boghos v. Certain Underwriters at Lloyd's of London* (2005) 36 Cal.4th 495, 503.) Given our Legislature's practice of separately imposing the duty to cover services and the duty to directly reimburse providers, it contravenes legislative intent to

12

treat the duty to cover as including the duty to directly reimburse providers and to thereby impose a duty upon insurance companies to directly reimburse where the Legislature has chosen not to do so. (*Hoffman v. Young* (2022) 13 Cal.5th 1257, 1272 (*Hoffman*) [where "two statues relate to the same topic and have a similar purpose" but have "different terms," those differences should be given effect].)

Second, Prime contends that the legislative history underlying the Insurance Code obligates us to recognize a substantive duty by insurance companies to directly reimburse out-of-network providers the reasonable and customary value of any emergency services they provide.[9] Of course, the best and clearest expression of legislative intent is the language of the statutes themselves (*San Diegans for Open Government v. Public Facilities Financing Authority of City of San Diego* (2019) 8 Cal.5th 733, 740 ["'text of [a] statute [is] the best indictor of legislative intent'"]), and the provisions of the Insurance Code at issue here impose no such duty. Where, as here, the statutory text is silent and the reading urged by a party would significantly change the liability of insurance companies, our Legislature's intent to effect such a change must be plain and obvious in the legislative record because, as our Supreme Court has noted, our "'Legislature "does not . . . hide elephants in mouseholes."'" (*Jones v. Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1171.)

We find no such clear evidence here. Prime cites a committee report analyzing the 1998 bill that added section

---

[9] Prime also cites legislative history underlying the Knox-Keene Act, but that has no bearing on what our Legislature intended in enacting portions of the *Insurance Code.*

13

10123.147 to the Code, but that report merely noted that the bill would "make[] various changes to the payment of emergency services and other provider claims." (Sen. Com. on Ins., Analysis of Assem. Bill No. 1560 (1997-1998 Reg. Sess.) as amended June 24, 1998, p. 1.) That description is wholly consistent with interpreting section 10123.147 as changing the procedures for reimbursement for claims that are otherwise covered by an insurance policy or the Insurance Code; it would be an obtuse way to announce a massive substantive expansion of the liability of health insurance companies. While that report also indicates that the bill "[p]rohibits a health plan or insurer from [] delaying *payment* of a claim from a physician or other provider to await the submission of a claim from a hospital" and "require[s] *payment* for portions of a claim not in dispute" (italics added), the report's reference to "payment[s]" addresses the timing and prerequisites of payments otherwise required; it does not purport to create or otherwise recognize a substantive, direct right of reimbursement running between an insurer and an out-of-network provider. Prime next cites a Senate committee's "background information worksheet" analyzing the effect of a 2005 amendment to section 10123.147, and asserts that it establishes "protections for health care providers regarding reimbursement by insurers." (Emphasis omitted.) Prime misses the gist of that worksheet, which actually explains that those protections are *procedural*: The worksheet notes that a complaint hotline would be established within the Department of Insurance, as one already existed within the DMHC as to health service plans, because a complaint process would "help[] to ensure that patients and providers will not be responsible for paying for services that should be paid under the terms of their

14

cont[r]act with a health insurance company." The worksheet nowhere suggests an intent to hold health insurance companies directly liable to providers. Prime lastly cites a letter from one interest group to the author of the 2005 amendment to section 10123.147, but what a constituent thinks about a bill has no bearing on what the Legislature was thinking.

Third, Prime asserts that we must construe the Insurance Code to impose a duty on insurance companies to directly reimburse out-of-network providers for emergency services because the Knox-Keene Act imposes such a duty on health care service plans and because, in Prime's view, the Insurance Code was "inten[ded] to mirror" and be in "parity" with the Knox-Keene Act. To be sure, the Insurance Code and the Knox-Keene Act both function as a mechanism for providing a form of health coverage (which is why health care service plans are deemed to be part of the insurance industry for purposes of federal preemption affecting state insurance laws). (See, e.g., *Coast Plaza Doctors Hospital v. Blue Cross of California* (2009) 173 Cal.App.4th 1179, 1187 [Knox-Keene Act is "specifically directed toward the insurance industry" for purposes of ERISA]; *Smith v. PacifiCare Behavioral Health of Cal., Inc.* (2001) 93 Cal.App.4th 139, 157-158 [health care service plans governed by Knox-Keene Act are "engaged in the business of insurance" for purposes of the McCarran-Ferguson Act].) But they are nevertheless "distinct regulatory regimes." (*Smith*, at pp. 158-159, italics omitted.) The Knox-Keene Act expressly declines to regulate entities regulated by the Department of Insurance unless those entities are "directly providing healthcare services" (Health & Saf. Code, § 1343, subd. (e)(1)) (and, here, United is not); and the Insurance Code expressly declines to regulate health care service plans (§

15

740, subd. (g); *Hailey v. California Physicians' Service* (2007) 158 Cal.App.4th 452, 469-470; *Williams v. California Physicians' Service* (1999) 72 Cal.App.4th 722, 729 (*Williams*).) Thus, the statutory provision in the Knox-Keene Act imposing a duty upon health care service plans to directly reimburse out-of-network providers for emergency services cannot be copied-and-pasted into the Insurance Code. To do so is to ignore the maxim, noted above, that statutes dealing with the same topic and with a similar purpose are not to be treated the same if the Legislature has employed different language. (*Hoffman, supra*, 13 Cal.5th at p. 1272.)

Prime resists this conclusion. It cites *Pesce v. Department of Alcoholic Beverage Control* (1958) 51 Cal.2d 310, urging that we must construe all Codes within California as a single Code, but this principle does not permit us to wipe away distinctions our Legislature has drawn merely because those distinctions happen to be in different Codes. More to the point, this principle has been rejected in several cases that refused to treat provisions in the Knox-Keene Act and the Insurance Code as interchangeable. (E.g., *Williams, supra*, 72 Cal.App.4th at p. 731; *Nieto v. Blue Shield of California Life & Health Ins. Co.* (2010) 181 Cal.App.4th 60, 84-85.) Prime also worries that rejecting its position leads to results inconsistent with *Santa Clara, supra*, 14 Cal.5th 1034; *Prospect, supra*, 45 Cal.4th 497; *Long Beach Memorial Medical Center v. Kaiser Foundation Health Plan, Inc.* (2021) 71 Cal.App.5th 323; *Bell, supra*, 131 Cal.App.4th 211; and *California Emergency Physician Medical Group v. PacifiCare of California* (2003) 111 Cal.App.4th 1127, overruled on other grounds by *Centinela, supra*, 1 Cal.5th at p. 1014, fn. 10; but all of those cases arose under the Knox-Keene Act, and our

construction of the Insurance Code has no effect on the Knox-Keene Act.

Fourth, Prime argues that denying emergency service providers a right to sue health insurance companies for direct reimbursement at a reasonable and customary rate under the Insurance Code—while granting that right to health care service plans under the Knox-Keene Act—is bad public policy, is unfair under common-law notions of restitution, and borders on being confiscatory given that those providers *must* provide emergency services. For starters, it is not our place—as part of the judicial branch—to weigh in on the wisdom of public policy enacted by our Legislature. (*Los Angeles County Metropolitan Transportation Authority v. Alameda Produce Market, LLC* (2011) 52 Cal.4th 1100, 1112 ["policy argument[s]" are "'best directed to the Legislature'" as the courts' "'role . . . is to interpret the statute[s] [as they are written], not to establish policy'"]; *Vasquez v. State of California* (2008) 45 Cal.4th 243, 253 ["We may not rewrite the statute to confirm to an assumed intention that does not appear in its language"].) We may intervene only if the statute before us leads to absurd results or is unconstitutional. (*California School Employees Assn. v. Governing Board* (1994) 8 Cal.4th 333, 340; *Steen v. Appellate Division of Superior Court* (2014) 59 Cal.4th 1045, 1054; cf. *McMillin Albany LLC v. Superior Court* (2018) 4 Cal.5th 241, 249 [common law may be abrogated by statutes].) Neither ground exists here.

Prime asserts it faces an absurd and unconstitutional outcome because it would be without recourse if an insurance company paid just a "penny" for the emergency services its hospitals provided, as Prime would be unable to sue the insured

and, even if it could, that would lead to a multiplicity of lawsuits. Prime's assertion ignores that, during the "claims period" (as Prime calls it) at issue here, the Insurance Code did not bar Prime from seeking recourse against an insured; ignores that insureds during that "claims period" could simply assign to the providers their right to sue the insurance company, thereby avoiding a multiplicity of lawsuits (*Coast Plaza Doctors Hospital v. UHP Healthcare* (2002) 105 Cal.App.4th 693, 704); and ignores that concerns about too much litigation are a matter of policy for the Legislature.[10]  Further, Prime is simply wrong that it faces any danger of receiving only a "penny" for its emergency services. That is because, during the "claims period" at issue in this lawsuit, federal law set a minimum amount that out-of-network providers must be paid for their emergency services—namely, the "greatest" of (1) the amount paid to in-network providers for the emergency services provided, (2) the amount "calculated using the same method the plan generally uses to determine payments for out-of-network services (such as the usual, customary and reasonable amount)," or (3) the amount for those services under

---

**10**     During the "claims period" at issue here, only the Knox-Keene Act barred recourse against insureds based on that Act's express, statutory duty of direct reimbursement.  (*Prospect, supra*, 45 Cal.4th at pp. 508-509.)

As of January 1, 2022, Congress's No Suprises Act prohibits balance billing by insurers, as well.  (42 U.S.C. § 300gg-131(a); 45 C.F.R. § 149.410(a).)  At oral argument, Prime conceded (notwithstanding that its lawsuit was filed in March 2022, after the Act took effect), that "what's at issue here is the time period before" the No Surprises Act.

18

Medicare.  (29 C.F.R. § 2590.715-2719A(b)(3)(i).)[11]  Prime displays its true colors when, as its fallback position, it complains that out-of-network providers should not be limited to these amounts and, in fact, should be able to receive *more* than in-network providers.  But it is *this* outcome that would lead to absurd results because it would disincentivize providers from joining an insurance company's network, would thereby eliminate the stability and certainty arising from having established contractual relationships with settled payment rates, and would result in a multiplicity of lawsuits aimed at settling the reasonable and customary rates.  Thus, our Legislature's decision not to impose a duty upon insurance companies of direct reimbursement to out-of-network providers of emergency services is neither absurd nor confiscatory.

Fifth and finally, Prime contends that the collective force of its prior four arguments dictates a result in its favor.  We disagree, as we find its arguments without merit whether viewed individually or collectively.

In light of our de novo analysis, we have no occasion to address Prime's further arguments attacking aspects of the trial court's reasoning (such as the court's analogy to Health and Safety Code section 1317.2a or its citation to the Legislature's

---

[11]     The No Surprises Act sunsets this provision that established a substantive standard for minimum payment, and replaced it with a procedural mechanism requiring insurers and providers to engage in "open negotiation" followed by an arbitration to set the rate for reimbursement.  (42 U.S.C. § 300gg-111; see *Texas Medical Assn. v. United States Dept. of Health & Human Services* (5th Cir. 2024) 110 F.4th 762, 767-769.)  Again, Prime acknowledged at oral argument that these provisions do not apply to its lawsuit.

failure to enact a bill that would have created the right of direct reimbursement according to a specific formula).  We also have no occasion to address arguments made by United that are not relevant to our analysis.

*  *  *

In the end, our task is a narrow one.  Prime's arguments about the disparate treatment of health insurance companies and health care service plans when it comes to direct reimbursement for emergency services is not without persuasive force.  But the branch that needs to be persuaded by these policy arguments is not us—it is the legislative branch.

## DISPOSITION

The order is affirmed.  United is entitled to costs on appeal.
<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, P.J.
HOFFSTADT


We concur:


_____, J.
 BAKER


_____, J.
 MOOR