Filed 2/27/26; Certified for Publication 3/12/26 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| POMONA VALLEY HOSPITAL MEDICAL CENTER,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>KAISER FOUNDATION HEALTH PLAN, INC.,<br><br>Defendant and Appellant. | B337963, B339448<br><br>(Los Angeles County Super. Ct. No. K069796) |

APPEALS from a judgment of the Superior Court of Los Angeles County.  Lynette Gridiron Winston, Judge.  Reversed in part and remanded with directions.

King & Spalding, Daron L. Tooch, Paul R. Johnson, Amanda L. Hayes-Kibreab and Ariana E. Fuller for Plaintiff and Appellant.

Reed Smith, Amir Shlesinger, Kasey J. Curtis, Michelle L. Cheng; Kellogg, Hansen, Todd, Figel & Frederick, Daniel G. Bird, Eric J. Maier and Kathleen W. Hickey for Defendant and Appellant.

_____

Kaiser Foundation Health Plan, Inc. (Kaiser) provides medical services to its members primarily through its own healthcare facilities. In an emergency, however, a Kaiser member may go to a non-Kaiser emergency department.

Pomona Valley Hospital Medical Center (Pomona Valley Hospital) is a regional hospital with an emergency department. Under federal and state law, Pomona Valley Hospital is required to provide emergency medical services to anyone in need of such services. Kaiser is required to reimburse Pomona Valley Hospital for emergency services provided by Pomona Valley Hospital to Kaiser members. Through most of 2017, Kaiser did so pursuant to a contract executed with Pomona Valley Hospital in 2004 (the 2004 Contract). In 2017, Kaiser terminated the 2004 Contract and began paying amounts that it unilaterally determined to be the reasonable value of Pomona Valley Hospital's emergency services.

Pomona Valley Hospital, dissatisfied with the non-contracted amounts paid by Kaiser, sued in quantum meruit for the asserted unreimbursed reasonable value of emergency medical services provided from October 2017 through March 2020. Pomona Valley Hospital claimed that it was owed approximately $66 million more than the approximately $40 million reimbursed by Kaiser.

The matter went to a jury trial and the jury returned a verdict in the amount sought by Pomona Valley Hospital. Subsequently, the trial court granted a motion for new trial brought by Kaiser, finding that it was legal error to allow as evidence at trial the 2004 Contract between Kaiser and Pomona Valley Hospital previously governing rates paid for emergency services. The court, however, entered a conditional order allowing Pomona Valley Hospital to accept an approximate $8 million remittitur to the verdict in lieu of a new trial. Pomona Valley Hospital accepted the remittitur.

Following entry of judgment, Kaiser appealed and Pomona Valley Hospital cross-appealed. Kaiser makes four primary contentions on

appeal: (1) that the trial court properly granted the motion for new trial but improperly allowed for remittitur because admission of the 2004 Contract impacted the issue of liability, not just damages; (2) that the trial court erroneously excluded evidence of Pomona Valley Hospital's overall operating costs at trial; (3) that Pomona Valley Hospital presented improper expert testimony; and (4) that the proper rate of prejudgment interest is 7 percent, not 10 percent as awarded. Pomona Valley Hospital's cross-appeal relies on a single argument: that there was no legal error in allowing the 2004 Contract as evidence and therefore Kaiser's motion for new trial should have been denied.

We agree with Pomona Valley Hospital that the trial court erred in granting the new trial motion. We conclude that the 2004 Contract was properly introduced at trial because a provision of the contract excluding its use in certain matters only applied by its terms to valuations under subdivision (a)(3)(B) of section 1300.71 of title 28 of the California Code of Regulations (Regulation 1300.71). The issue decided by the jury in this case was not a valuation under the regulation, but rather a distinct quantum meruit valuation. As such, the 2004 Contract was properly considered by the jury.

We additionally reject each of Kaiser's remaining contentions except for the final one, that 7 percent was the proper rate of prejudgment interest.

## BACKGROUND

**The parties**

Kaiser is a health care service plan that, with affiliated entities, has providers, hospitals, and other medical facilities throughout California. Although Kaiser members predominantly receive medical care through the Kaiser system, in an emergency they may go to the closest emergency department, including one not associated with Kaiser. Kaiser hospitals likewise provide emergency care to non-Kaiser patients.

3

Pomona Valley Hospital is a full-scope hospital and regional medical center with operations including a trauma center and other specialized care. As a hospital with an emergency department, Pomona Valley Hospital treats patients in need of emergency care, including Kaiser members. For the period at issue in this case, from October 1, 2017, through March 31, 2020, a total of 4,078 claims for emergency care services provided by Pomona Valley Hospital were for Kaiser members.

**Emergency services and reimbursement**

As previously noted, under federal and state law, a hospital emergency department must provide emergency services to anyone in need of such care. (42 U.S.C. § 1395dd(b); Health & Saf. Code,[1] § 1317, subd. (a).) California's Knox-Keene Health Care Service Plan Act of 1975 (the Knox-Keene Act) (§ 1340 et seq.), "a comprehensive system of licensing and regulation under the jurisdiction of the Department of Managed Health Care [(DMHC)]" (*Bell v. Blue Cross of California* (2005) 131 Cal.App.4th 211, 215 (*Bell*)), governs health care service plans and obligations relating to emergency services. (*Prospect Medical Group, Inc. v. Northridge Emergency Medical Group* (2009) 45 Cal.4th 497, 504–505 (*Prospect Medical Group*).) The Knox-Keene Act requires a health care service plan to reimburse a hospital for providing "emergency services and care" to the plan's members "until the care results in stabilization." (§ 1371.4, subd. (b); see also *County of Santa Clara v. Superior Court* (2023) 14 Cal.5th 1034, 1037–1038, 1042 (*County of Santa Clara*).)

The DMHC, which has authority to promulgate regulations under the Knox-Keene Act, issued, among other regulations, section 1300.71, setting forth standards for reimbursement of emergency services. (*County of Santa Clara, supra,* 14 Cal.5th at p. 1042.) "The

---

[1] Undesignated statutory references are to the Health and Safety Code.

amount of reimbursement depends upon whether the hospital and plan already have a contract in place:  If they do, the plan must pay the 'agreed upon' contractual rate [(Regulation)] 1300.71, subd. (a)(3)(A); if they do not, the plan must pay the 'reasonable and customary value for the [emergency] health care services rendered' (*id.*, subd. (a)(3)(B))." (*Long Beach Memorial Medical Center v. Kaiser Foundation Health Plan, Inc.* (2021) 71 Cal.App.5th 323, 329 (*Long Beach Memorial*).) Regulation 1300.71, subdivision (a)(3)(B) lists six criteria for determining the " 'reasonable and customary value' " of the services. (*Id.* at p. 335.)

The 2004 Contract between Kaiser and Pomona Valley Hospital established an agreed upon rate of reimbursement for emergency services provided by Pomona Valley Hospital to Kaiser members in accordance with Regulation 1300.71, subdivision (a)(3)(A).  As relevant here, Kaiser agreed to reimburse 86 percent of Pomona Valley Hospital's billed charges for emergency services.  The 2004 Contract further provided that Pomona Valley Hospital could not "Balance-Bill" Kaiser members—a practice where hospitals previously sought to directly recover from patients the remainder of billed amounts not paid by their health service plans and which was outlawed in 2009 by *Prospect Medical Group, supra,* 45 Cal.4th at page 502.  Additionally, the 2004 Contract allowed either party to terminate the contract, at least one year after its effective date, by providing written notice of termination, with termination to become effective 180 days thereafter.

The 2004 Contract remained in effect for over 12 years.  In March 2017, Kaiser gave notice to Pomona Valley Hospital that it was terminating the 2004 Contract effective September 30, 2017.  At trial, a Kaiser representative stated that Kaiser's intent was to try to renegotiate the contract but that the parties could not come to an agreement on rates.  In the months following the termination notice, and without a new contract in place, Kaiser informed Pomona Valley Hospital that it would reimburse 29 percent of billed charges for

5

emergency services claims.  According to Kaiser, it calculated 29 percent as a fair and reasonable rate by reference to an internal methodology.

**Pomona Valley Hospital sues Kaiser**

In November 2017, shortly after termination of the 2004 Contract, Pomona Valley Hospital filed this action.  The operative first amended complaint, filed in March 2019, stated (as relevant to this appeal) a cause of action for quantum meruit premised on Kaiser's alleged failure to reimburse the reasonable value of emergency services provided to Kaiser members.  During the period at issue—from October 1, 2017, through March 30, 2020—Kaiser reimbursed approximately $39.8 million out of approximately $136.6 million in total billed charges, a roughly 29 percent reimbursement rate.  Pomona Valley Hospital alleged that Kaiser's payments were insufficient to cover the reasonable value of emergency services provided, and it sought to recover the remainder.

Pomona Valley Hospital's choice to bring its suit in quantum meruit was consistent with relevant authority, which sets out a potential two-step process for obtaining reimbursement.  As noted previously, without a contract in place, a health care service plan must pay the hospital the "reasonable and customary value" for emergency services. (Regulation 1300.71, subd. (a)(3)(B).)  The health care service plan is to determine this amount with reference to subdivision (a)(3)(B) of Regulation 1300.71, which provides that the value be determined "based upon statistically credible information that is updated at least annually and takes into consideration:  (i) the provider's training, qualifications, and length of time in practice; (ii) the nature of the services provided; (iii) the fees usually charged by the provider; (iv) prevailing provider rates charged in the general geographic area in which the services were rendered; (v) other aspects of the economics of the medical provider's practice that are relevant; and (vi) any unusual circumstances in the case."

6

As the DMHC has explained, however, the " 'regulations are intended to set forth the *minimum* payment criteria to ensure compliance with the [Knox-Keene] Act's claims payment and dispute resolution standards.' " (*Children's Hospital Central California v. Blue Cross of California* (2014) 226 Cal.App.4th 1260, 1273 (*Children's Hospital*).) The DMHC advised that "the intent was to establish a methodology for determining the reasonable value of health care services by noncontracted providers but that the criteria specified do not dictate a specific payment rate," and that "[i]f a payor fulfills its claims payment obligation using these criteria, the DMHC will consider the payor compliant with Health and Safety Code sections 1371 and 1371.35, i.e., the reimbursement of the claim will be deemed timely." (*Children's Hospital*, at p. 1273.)

Courts and the DMHC have recognized that this initial, minimum payment does not always represent the proper amount of reimbursement, and so a second step—a quantum meruit suit—may be necessary. "If a hospital or other medical provider believes that the amount of reimbursement it has received from a health plan is below the 'reasonable and customary value' of the emergency services it has provided, the hospital or provider may assert a quantum meruit claim against the plan to recover the shortfall." (*Long Beach Memorial, supra,* 71 Cal.App.5th at p. 335.) The DMHC, " 'unlike the courts, lacks the authority to set specific reimbursement rates under theories of *quantum meruit* and the jurisdiction to enforce a reimbursement determination on both the provider and the health plan. Because the [DMHC] cannot provide an adequate forum, health care providers must be allowed to maintain a cause of action in court to resolve individual claims-payment disputes over the reasonable value of their services.' " (*Bell, supra,* 131 Cal.App.4th at p. 218 [quoting and relying on amicus curiae brief filed in *Bell* by DMHC].)

In a quantum meruit action for reimbursement of services provided under the Knox-Keene Act, the proper measure for

7

reimbursement is the reasonable or fair market value of the services. (*Children's Hospital, supra,* 226 Cal.App.4th at p. 1274; *Long Beach Memorial, supra,* 71 Cal.App.5th at p. 345.) This value is measured by what a hypothetical willing buyer would pay to a hypothetical willing seller in a hypothetical transaction. (*Long Beach Memorial*, at pp. 345–346.) The "law looks to the 'reasonable value of [the] services' in the 'open market,' and explicitly acknowledges that this value may be different than the price fixed by a prior contract between the parties to that case." (*Id.* at p. 345.) In determining the reasonable or fair market value, a "wide variety of evidence" is properly considered. (*Children's Hospital*, at p. 1274.)

**Trial proceedings and verdict**

The matter proceeded to a jury trial in January 2023, at which the parties' experts played a significant role.

Pomona Valley Hospital's expert, Chris Fritz, opined that the fair market value of emergency services provided to Kaiser members was 77.5 percent of the hospital's total billed charges. In coming to this percentage, Fritz considered six different sets of rates negotiated for emergency services: the 86 percent rate under the 2004 Contract; an average 80 percent rate from single case "letter[s] of agreement" for specific out-of-network claims at Pomona Valley Hospital; average rates of 80 percent and 70 percent respectively contracted by Kaiser and Pomona Valley Hospital for "rental networks" of health plans with relatively few members; 53 percent, based on rates paid by Kaiser to other hospitals pursuant to contract; and rates paid to Pomona Valley Hospital pursuant to in-network contracts with large commercial health plans (referred to at trial as "the big six" plans).

In assigning a percentage to the last of these categories—which was by far the largest set of claims—Pomona Valley Hospital's expert did not use the actual rate paid under the in-network contracts because he considered the rate to be artificially low for calculating reasonable value in this case. This was due to the large health plans' role in

8

"steerage" of patients to non-emergency elective services at the hospital. According to Fritz, steerage increases non-emergency patient volume and benefits the hospital financially and logistically. Because Kaiser members predominantly receive only emergency services at Pomona Valley Hospital, the hospital does not obtain the advantage of providing other services to Kaiser members that it does with in-network plans. In an attempt to adjust for this differing impact, Fritz assigned a multiplier to the relatively low percentage paid by the large health plans to "make them more comparable to the out-of-network claims that are at issue in this dispute," and came up with a weighted average rate of 75 percent. Finally, Fritz took the median value of the six categories he considered in estimating that the fair market value for the emergency services provided to Kaiser members was 77.5 percent of the hospital's billed charges.

In contrast, Kaiser's expert, Mark Gustafson, opined that the amount of approximately $39.8 million that Kaiser had already reimbursed "exceed[ed] the fair market value . . . and no additional payment would be warranted." According to Gustafson, contracted commercial insurers would have reimbursed an average of 26.3 percent of the total billed charges at issue, while Kaiser itself reimbursed approximately 29 percent. Gustafson further testified that the amount Kaiser was previously paying Pomona Valley Hospital under the terminated 2004 Contract increased at a rate "much faster than the price of hospital services generally"—8.4 percent compared to 4.6 percent. He additionally contrasted Pomona Valley Hospital's charges with those of other hospitals in the region and found Pomona Valley Hospital's charges "roughly higher than 80 percent of the hospitals."

The jury returned a verdict form in which it answered two questions. First, the jury found that Pomona Valley Hospital proved that the reasonable or fair market value for the 4,078 claims at issue was $105,887,963. Second, the jury subtracted from this amount the $39,796,251 already reimbursed by Kaiser to calculate an amount due

9

of $66,091,712. The amount awarded prior to reduction equaled roughly 77.5 percent of the total charges, the same percentage that Fritz opined was appropriate, and the amount that Pomona Valley Hospital maintained was warranted during closing argument.

**Motion for new trial and final judgment**

Judgment on the jury verdict was entered approximately a year later, after other issues not relevant to this appeal were resolved, and after the case had been reassigned to a different judge.

Following entry of the original judgment, Kaiser filed a motion for new trial. Kaiser made a number of arguments, three of which align with claims it makes on appeal: that the trial court's admission of the 2004 Contract into evidence was prejudicial legal error, that the trial court erroneously excluded evidence of Pomona Valley Hospital's operating costs, and that the testimony presented by Pomona Valley Hospital's expert, Fritz, was improper. Pomona Valley Hospital opposed the motion.

The trial court agreed with Kaiser's first argument and rejected the latter two. In partially granting the motion the court found that the previous denial of a motion in limine filed by Kaiser—in which Kaiser sought to exclude the 2004 Contract as irrelevant and unduly prejudicial—was erroneous as a matter of law and unfairly prejudiced Kaiser at trial.

The trial court further concluded, however, that this stated error "was essentially limited in effect to the question of damages," not liability, and found that remittitur of the amount awarded was "the proper remedy to cure the error and avoid the necessity of a new trial." The court thus issued a conditional order granting a new trial unless Pomona Valley Hospital consented to a reduction of the verdict to $58,030,564.08. The court reached this sum by removing the 2004 Contract rate from the six categories considered by Fritz and calculating a new average based on the remaining five factors, subtracting the amount Kaiser previously reimbursed.

10

Pomona Valley Hospital accepted the remittitur, and the trial court entered an amended judgment in place of the original judgment, awarding prejudgment interest to Pomona Valley Hospital at a rate of 10 percent.  Kaiser timely appealed from the final judgment and Pomona Valley Hospital timely cross-appealed.[2]

## DISCUSSION

### I.     Kaiser's motion for new trial was erroneously granted

Kaiser's first argument on appeal is that, while the trial court correctly granted its motion for new trial based on the finding that admission of the 2004 Contract was an error of law, the court then erred by allowing for remittitur.  Kaiser contends that the motion instead should have been granted in full because the issues of liability and damages were interwoven and both impacted by admission of the 2004 Contract, and retrial was therefore required.  Pomona Valley Hospital, on the other hand, argues in its cross-appeal that the trial court committed reversible error in conditionally granting the motion for new trial, and that the jury verdict should have been allowed to stand.

We conclude that the trial court erred in granting the new trial motion and accordingly do not reach Kaiser's argument that remittitur was an improper remedy.

### A.     *Relevant background*

The trial court conditionally granted Kaiser's new trial motion based on its finding that the court had previously committed legal error in denying Kaiser's first of eight motions in limine.

That first motion in limine sought to exclude the 2004 Contract from evidence at trial, as well as "any other evidence related to the

---

[2] Following the plaintiff's acceptance of a remittitur, "if the defendant appeals, the plaintiff may cross-appeal because the defendant's appeal deprives the plaintiff of the benefits of consenting to the remittitur." (*King v. U.S. Bank National Assn.* (2020) 53 Cal.App.5th 675, 680, fn. 1.)

existence of the 2004 Contract, its contract rate and claims paid under that rate, or its termination." According to Kaiser's notice of the motion, the motion was "made on the grounds that any such evidence or argument is irrelevant and will unduly prejudice Kaiser. *See* Cal. Evid. Code §§ 350, 352."

In the motion, Kaiser argued that it and Pomona Valley Hospital had a contractual agreement not to use the 2004 Contract in a case like the present one. Kaiser based this assertion on a clause in the 2004 Contract, section 3(G), which stated: "Nothing in this Section 3 [Compensation for Covered Services] shall be construed as an admission or otherwise used as evidence concerning what constitutes the reasonable and customary value of [Pomona Valley Hospital's] services under section 1300.71 (a)(3)(B), 28 Cal. Code of Reg." Kaiser asserted both that the parties had agreed that the payment rate in the 2004 Contract was not relevant and not admissible as evidence of reasonable value, and that the contract was not probative of reasonable value due to changes in the law since the time of its execution, including that balance billing had since been outlawed.

At the hearing on the motion in limine, following argument by the parties, the trial court took the matter under submission. Later, the court denied the motion in limine in a written order stating: "The court denies this motion based upon the plain meaning of the 2004 contract term at issue."

Following the verdict, Kaiser argued in its motion for new trial that the court committed an " '[e]rror in law' " by denying the motion in limine and allowing the 2004 Contract as evidence at trial. Kaiser focused on the language of section 3(G) of the 2004 Contract, arguing that Pomona Valley Hospital's quantum meruit action was a claim for " 'reasonable and customary value' " under Regulation 1300.71, subdivision (a)(3)(B), and so should have been excluded.

The trial court concurred with Kaiser's analysis, stating that Kaiser and Pomona Valley Hospital "agreed that the compensation

terms agreed to by the parties would not be used as evidence to determine the reasonable and customary values of services rendered as that term is defined in Section 1300.71, subdivision (a)(3)(B)."  The court found that Pomona Valley Hospital's quantum meruit action was based on Regulation 1300.71, subdivision (a)(3)(B), and thus section 3(G) of the 2004 Contract applied to exclude the 2004 Contract.  The court further concluded that it was legal error to deny Kaiser's motion in limine to exclude the contract and that the error was prejudicial to Kaiser.  Based on these findings, the court conditionally granted Kaiser's motion for new trial.

## B.  *Review of the new trial order*

An order granting or denying a new trial motion is generally reviewed for abuse of discretion, with the appellate court independently determining whether any error was prejudicial.  (*Argueta v. Worldwide Flight Services, Inc.* (2023) 97 Cal.App.5th 822, 832.)  We review the ruling underlying the new trial order, however, " 'under the test appropriate to such determination.' "  (*Id.* at p. 833.)[3]  Kaiser's motion for new trial argued that the denial of its first motion in limine was an error in law.  (See Code Civ. Proc., § 657, subd. (7) [new trial allowed for "[e]rror in law"].)  Whether that initial denial was an error in law is an issue we review de novo.  (*Smith v. Magic Mountain LLC* (2024) 106 Cal.App.5th 1128, 1135.)

A trial court has "no discretion to grant a new trial unless its original ruling, as a matter of law, was erroneous."  (*Ramirez v. USAA Casualty Ins. Co.* (1991) 234 Cal.App.3d 391, 397; see also *Tun v. Wells Fargo Dealer Services, Inc.* (2016) 5 Cal.App.5th 309, 323.)  "Where a new trial is granted on the basis of legal error, we must first determine

---

[3] The fact that the trial court judge who heard the motion for new trial was not the same judge who ruled on the motions in limine or presided at trial did not limit the judge's authority in ruling on the motion for new trial.  (*Sandco American, Inc. v. Notrica* (1990) 216 Cal.App.3d 1495, 1508–1509.)

whether the ruling the trial court claims was made in error is as a matter of law truly error." (*Donlen v. Ford Motor Co.* (2013) 217 Cal.App.4th 138, 147 (*Donlen*).)  If the original order was legally correct, the new trial order was an abuse of discretion and is properly reversed.  (*Ibid.*)

**C.** ***Considered in the proper context, the original order was not erroneous as a matter of law***

In granting the new trial motion, the trial court focused on the language of the 2004 Contract's section 3(G) limiting the contract's use as evidence.  The court ruled that the prior judge had erred in interpreting this contract provision in deciding the motion in limine, and, based on the court's new, differing interpretation, it conditionally granted the motion for new trial.  In so ruling, the court improperly disregarded the procedural context in which the motion in limine was decided, as well as later events relevant to the determination.

As noted previously, the stated reason for denial of the motion in limine was "the plain meaning of the 2004 contract term at issue." Whether the trial court's brief stated reason for denying the motion in limine was correct or not, however, should not have been the sole consideration in deciding the new trial motion.  "No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason." (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 18–19 (*D'Amico*).)  A similar standard applied when the trial court was faced with the motion for new trial, since it was obligated to consider whether the denial of the motion in limine was necessarily, as a matter of law, erroneous.  (See *Donlen, supra,* 217 Cal.App.4th at p. 147.)  The ruling underlying a new trial order "is scrutinized under the test appropriate to such determination." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 859.)  Because the result

of the trial court's initial ruling—denial of the motion in limine—was proper, the new trial motion should have been denied.

First, per Kaiser's notice of motion, the motion in limine was solely brought under Evidence Code sections 350 and 352 "on the grounds that any such evidence or argument is irrelevant and will unduly prejudice Kaiser." A notice of motion must state "the grounds upon which it will be made." (Code Civ. Proc., § 1010; see also Cal. Rules of Court, rule 3.1110(a) [accord].) "As a general rule, the trial court may consider only the grounds stated in the notice of motion." (*Luri v. Greenwald* (2003) 107 Cal.App.4th 1119, 1125.) Although "[a]n omission in the notice may be overlooked if the supporting papers make clear the grounds for the relief sought" (*ibid.*), there was no requirement that the trial court do so here. Indeed, under the "legal standard" section of Kaiser's motion in limine, it again relied solely upon Evidence Code sections 350 and 352, and it argued that the 2004 Contract "should be excluded as irrelevant evidence."

A trial court has broad discretion in ruling on evidentiary questions of relevance and prejudice under Evidence Code sections 350 and 352. (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 281; *Donlen, supra,* 217 Cal.App.4th at p. 147.) This principle holds particular force in a quantum meruit action like this one where "a wide variety of evidence" is accepted and, as a general matter, "a written contract providing for an agreed price is admissible in evidence." (*Children's Hospital, supra,* 226 Cal.App.4th at p. 1274.) The trial court, in deciding the motion in limine, did not err in concluding the 2004 Contract was relevant evidence that the jury could properly consider in determining the reasonable value of emergency services provided. In fact, on appeal, Kaiser does not dispute that the 2004 Contract, the 86 percent contractual rate, or the years of payments Kaiser made pursuant to the contract were relevant. Instead, Kaiser contends that section 3(G) should be construed to preclude use of the 2004 Contract as evidence, not that the contract itself is irrelevant.

15

Second, in deciding the new trial motion, the trial court did not give due consideration to the fact that in Kaiser's third motion in limine—which it filed concurrently with the first—Kaiser sought to preclude evidence of its "reimbursement methodology." Kaiser argued that whether its "methodology complies with [the] applicable regulation" was irrelevant, as "providers have [no] standing to challenge a plan's reimbursement methodology." Referencing Regulation 1300.71, Kaiser distinguished Pomona Valley Hospital's quantum meruit action from the "regulatory determination" of reimbursement methodology, and explained that a market value inquiry is distinct from the "regulatory process pursuant to which the initial payment by a healthcare service plan is made." Then, at oral argument on the matter, Kaiser's attorney maintained that "[t]he State is requiring us to come up with a methodology under this 1300.71 regulation," and "we have a methodology to pay these claims, but we're not here arguing that the results of the methodology, because of the factors of the methodology, are the quantum meruit value."

Thus, in this third motion in limine, which was granted in pertinent part, Kaiser argued a position—contrary to the one it took in the motion for new trial and now on appeal—that supports the trial court's initial order denying the first motion in limine. Section 3(G) of the 2004 Contract provided that the terms of the contract would not be "used as evidence concerning what constitutes the reasonable and customary value of [Pomona Valley Hospital's] services under [Regulation 1300.71, subdivision (a)(3)(B)]." In its third motion in limine, and at the hearing, Kaiser argued that the determination of value under Regulation 1300.71, subdivision (a)(3)(B) was separate from the determination required in a quantum meruit action. This argument was consistent with the trial court's finding on the first motion in limine that "the plain meaning of the 2004 contract term at issue," which covers only a determination "under" Regulation 1300.71, subdivision (a)(3)(B), did not preclude use of the 2004 Contract as

16

evidence in a separate quantum meruit action such as this one.[4] Kaiser cannot fault the trial court for effectively adopting its position. (See *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403 [party is estopped from asserting error induced by the party's conduct].)

Third, positions taken by Kaiser at trial, and prior to the time that the motion for new trial was made, affirmed the distinction between an initial valuation under Regulation 1300.71, subdivision (a)(3)(B) and the valuation required in a later quantum meruit action. The jury instruction on quantum meruit, which was requested by Kaiser, did not resemble Regulation 1300.71, subdivision (a)(3)(B) and its six criteria for determining the " 'reasonable and customary value' " of services. Instead, the instruction relied on a standard conception of quantum meruit, stating in pertinent part that under the law of quantum meruit, "Pomona Valley Hospital has the burden to prove the reasonable value, or fair market value, of services that were provided by [it]. The measure of recovery in quantum meruit is the reasonable value, or fair market value, of the services. Fair market value is the price that a hypothetical willing buyer of medical services would pay a hypothetical willing seller for the services, neither being under compulsion to buy or sell, and both having full knowledge of all pertinent facts. . . . In determining fair market value, you should consider the full range of transactions presented to you, but you are not bound by them." This jury instruction was consistent with case law distinguishing the criteria for determining value under Regulation 1300.71, subdivision (a)(3)(B) from a quantum meruit valuation. (See *Long Beach Memorial, supra,* 71 Cal.App.5th at pp. 345–346 [articulating quantum meruit standard]; *Children's Hospital, supra,*

---

[4] Pomona Valley Hospital's operative complaint referenced Regulation 1300.71, subdivision (a)(3)(B) as background in discussing Kaiser's initial reimbursement obligations. These references did not weigh in favor of a finding that this quantum meruit action was based on the regulation.

226 Cal.App.4th at p. 1274 [contrasting quantum meruit valuation from valuation under the regulation].)

In deciding the new trial motion, the trial court improperly disregarded this procedural and evidentiary background. Examined in the proper context—considering that Kaiser sought to exclude the 2004 Contract on grounds of relevance and prejudice and repeatedly took positions contrary to the reasoning advanced in the first motion in limine—it cannot be said that the denial of Kaiser's first motion in limine was erroneous as a matter of law. Accordingly, the trial court erred in granting Kaiser's motion for new trial.

**D.** *Regardless, the trial court's initial interpretation of the contractual clause was superior*

Even if the procedural context of the first motion in limine was properly disregarded and only the language of the 2004 Contract was considered in deciding whether to grant a new trial for error in law, the new trial order would still be improper. That is because the trial court's initial conclusion that section 3(G) of the 2004 Contract did not preclude use of the contract terms as evidence in this case was better than the court's later determination that it did.

When interpreting a contract, courts seek to give effect to the mutual intention of the parties as it existed at the time they entered into the contract. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264; see also Civ. Code, § 1636.) That intent is interpreted according to objective, rather than subjective, criteria. (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1126.) When the contract is clear and explicit, the parties' intent is determined solely by reference to the language of the agreement. (See Civ. Code, §§ 1638 ["language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity"], 1639 ["When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible"].) The words are to be understood "in their ordinary and

18

popular sense" (Civ. Code, § 1644) and the "whole of [the] contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other" (Civ. Code, § 1641).

However, " '[i]f the contract is capable of more than one reasonable interpretation, it is ambiguous [citations], and it is the court's task to determine the ultimate construction to be placed on the ambiguous language by applying the standard rules of interpretation in order to give effect to the mutual intention of the parties [citation].' " (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2003) 107 Cal.App.4th 516, 524–525.)  "Whether contractual language is ambiguous is a question of law that we review de novo. . . .  The interpretation of a contract, including the resolution of any ambiguity, is solely a judicial function unless the interpretation turns on the credibility of extrinsic evidence." (*American Alternative Ins. Corp. v. Superior Court* (2006) 135 Cal.App.4th 1239, 1245.)  Neither party submitted extrinsic evidence demonstrating their intent with respect to section 3(G) at the time they entered into the 2004 Contract, and so any review of the contract language is de novo.

Again, section 3(G) states:  "Nothing in this Section 3 [Compensation for Covered Services] shall be construed as an admission or otherwise used as evidence concerning what constitutes the reasonable and customary value of [Pomona Valley Hospital's] services under section 1300.71 (a)(3)(B), 28 Cal. Code of Reg."  This provision is hardly a model of clarity.  Indeed, evidence before the trial court showed that the provision was not used in any other contract. Kaiser argues in its briefing here that, in entering into this contract, it "recognized that . . . its agreement to a high, 86% reimbursement rate could be misused in later cases," and so section 3(G) was intended to preclude the use of the 86 percent rate as evidence in a quantum meruit action.  Kaiser, however, provides no record support for this assertion; an equally viable conjecture is that the parties agreed to this

19

poorly drafted provision with little if any consideration of its ultimate effect.

In accordance with the rules of contractual interpretation, we examine the language of the provision itself. One point stands out. The provision limits only evidence "concerning what constitutes the reasonable and customary value of . . . services *under* section 1300.71 (a)(3)(B), 28 Cal. Code of Reg." (Italics added.) When the required determination is a valuation that does not fall "under" Regulation 1300.71, subdivision (a)(3)(B), the provision does not apply. Based on case law clarifying the differing functions of Regulation 1300.71 and a quantum meruit action, the most logical conclusion is that section 3(G) does not apply to Pomona Valley Hospital's quantum meruit claim. Accordingly, the terms of the 2004 Contract, including the 86 percent reimbursement rate, were properly introduced at trial.

Valuation and reimbursement under Regulation 1300.71, subdivision (a)(3)(B) are different processes from valuation and reimbursement in a quantum meruit action and are based on different considerations. As noted above, Regulation 1300.71 sets out the first step for reimbursement of noncontracted emergency services, wherein a health plan determines "reasonable and customary value" of the services based on the six factors listed under subdivision (a)(3)(B). (*Children's Hospital, supra,* 226 Cal.App.4th at pp. 1271, 1273.) "These factors provide a framework for reimbursement, but do not necessarily resolve every dispute regarding the proper amount of payment." (*County of Santa Clara, supra,* 14 Cal.5th at p. 1043.) As the DMHC observed, the intent of the regulation was to "set forth the *minimum* payment criteria" and "establish a methodology for determining the reasonable value." (*Children's Hospital*, at p. 1273.) If reimbursement complies with the factors, the DMHC considers the reimbursement "timely." (*Ibid.*)

This first step of valuation and reimbursement, under Regulation 1300.71, subdivision (a)(3)(B), is not intended or expected to resolve all

reimbursement disputes. A second step—a quantum meruit action—becomes necessary when a provider believes that the full fair market value of the services has not been reimbursed under the first step. (*County of Santa Clara, supra,* 14 Cal.5th at p. 1038; *Long Beach Memorial, supra,* 71 Cal.App.5th at p. 335.) A quantum meruit action is separate from the reasonable and customary valuation and reimbursement process under Regulation 1300.71, subdivision (a)(3)(B). (*County of Santa Clara*, at p. 1053, fn. 10 [rejecting argument that "a quantum meruit action is unnecessary because the Knox-Keene Act provides adequate alternative mechanisms for resolving reimbursement disputes"]; *Long Beach Memorial,* at p. 337 [distinguishing reimbursement under Regulation 1300.71 from "the quantum meruit remedy already available to hospitals and other medical providers"]; *Bell, supra,* 131 Cal.App.4th at p. 216 ["nothing in" the Knox-Keene Act "preclude[s] a private action . . . at common law on a quantum meruit theory"].) A quantum meruit action is by necessity brought in a legal forum, as the DMHC " 'lacks the authority to set specific reimbursement rates' " or to enforce a quantum meruit reimbursement determination. (*Bell,* at p. 218.)

These different steps are distinguished, in part, by their purpose. In adopting Regulation 1300.71, the DMHC "was setting the minimum claims payment and dispute resolution standards to ensure compliance with the Knox-Keene Act's time requirements for claims reimbursement." (*Children's Hospital, supra,* 226 Cal.App.4th at p. 1276.) Under the regulation, a health care service plan like Kaiser is "statutorily obligated to pay *some* reimbursement amount within 30 or 45 days" of the time emergency services are provided. (*Long Beach Memorial, supra,* 71 Cal.App.5th at p. 343.) The purpose of a quantum meruit action in this context, on the other hand, is to resolve disputes over reimbursement. (*County of Santa Clara, supra*, 14 Cal.5th at pp. 1052–1053.) This second step—which is brought " 'in a court of law or through any other available civil remedy' "—can only occur after the

initial reimbursement is made pursuant to Regulation 1300.71 and thereafter disputed.  (*Children's Hospital, supra,* 226 Cal.App.4th at p. 1273; see also *Long Beach Memorial, supra,* 71 Cal.App.5th at p. 335.)

Furthermore, although the criteria for deciding reasonable value under Regulation 1300.71 may partially overlap with relevant criteria in a quantum meruit claim, there are also significant differences. Subdivision (a)(3)(B) of Regulation 1300.71 provides that a health care service plan is to determine "the reasonable and customary value for the health care services rendered based upon statistically credible information that is updated at least annually and takes into consideration" the six listed factors.  This methodology " 'is not a substitute for traditional forums for contract dispute resolution.' " (*County of Santa Clara, supra,* 14 Cal.5th at p. 1043.)  In contrast, "[i]n determining value in quantum meruit cases, courts accept a wide variety of evidence," including expert testimony, "agreements to pay and accept a particular price," " 'the price agreed upon by the parties,' " a  "professional's customary charges and earnings," and "the full range of fees," including the "scope of the rates accepted by or paid to [a] [h]ospital by other payors."  (*Children's Hospital, supra,* 226 Cal.App.4th at pp. 1274–1275, 1277.)  As explained in *Children's Hospital,* the "DMHC neither intended nor had the power to dictate payment rates or change California law on quantum meruit," and as such, Regulation 1300.71, subdivision (a)(3)(B) does not set out "the exclusive standard for determining the reasonable value" of services. (*Id.* at p. 1276.)  Indeed, this differing standard was recognized by Kaiser at trial, as the quantum meruit jury instruction it requested did not track the language of Regulation 1300.71, subdivision (a)(3)(B), but instead outlined a typical quantum meruit valuation, incorporating "reasonable value, or fair market value, of the services," and the "price that a hypothetical willing buyer of medical services would pay a

22

hypothetical willing seller for the services." (See *Long Beach Memorial, supra,* 71 Cal.App.5th at pp. 345–346.)

Kaiser argues for a broad reading of section 3(G) of the 2004 Contract, noting that *Children's Hospital* described section 1300.71, subdivision (a)(3)(B) as "incorporat[ing]" and "embod[ying] the concept of quantum meruit." (*Children's Hospital, supra,* 226 Cal.App.4th at p. 1274; see also *Sanjiv Goel, M.D., Inc. v. Regal Medical Group, Inc.* (2017) 11 Cal.App.5th 1054, 1061 [discussing *Children's Hospital*].) Kaiser takes this language out of context. In the section of the *Children's Hospital* opinion in which the court stated that 1300.71, subdivision (a)(3)(B) "embodies the concept of quantum meruit," the court nevertheless clarified that "*[t]he section 1300.71* [subdivision] *(a)(3)(B) factors are not the exclusive measure of value.*" (*Children's Hospital* at p. 1274.) The court went on to describe the standard quantum meruit valuation of " 'reasonable value,' " " 'going rate,' " " 'reasonable market value at the current market prices,' " and "the price that ' "a willing buyer would pay to a willing seller, neither being under compulsion to buy or sell, and both having full knowledge of all pertinent facts." ' " (*Ibid.*) Critically, *Children's Hospital* reiterated that, for purposes of a quantum meruit valuation, "courts accept a wide variety of evidence," and the factors listed in 1300.71, subdivision (a)(3)(B) are "not exclusive or necessarily appropriate in all [emergency medical service reimbursement] cases." (*Id.* at pp. 1274–1275.)

Kaiser additionally argues that section 3(G) should be given a broad reading because its stated exclusion of the 2004 Contract as evidence will be rendered meaningless otherwise. There are several problems with this argument. First, if the parties wished for the exclusion to apply more broadly to actions predicated on the Knox-Keene Act, or actions in quantum meruit, or actions brought in court, they simply could have said so. Instead, the exclusion is limited to "what constitutes the reasonable and customary value . . . under [Regulation 1300.71, subdivision (a)(3)(B)]." "The fact that the contract

23

expressly so provides tends to negate any inference that the parties also intended another consequence to flow from the same event. *Expressio unius est exclusio alterius.*" (*Stephenson v. Drever* (1997) 16 Cal.4th 1167, 1175.)

Second, Kaiser's assertion that section 3(G) will lack utility since the parties are unlikely to seek to exclude the 2004 Contract outside of a quantum meruit action does not weigh in favor of reading the provision broadly. Even if there were few to no applications of the clause as drafted, that does not mean that a narrow clause—limited to a subpart to a regulation to an entire statutory scheme—should be given a broad reading. We do not " 'insert in the contract language [a term] which one of the parties now wishes were there' " (*Estate of Jones* (2022) 82 Cal.App.5th 948, 953), and " 'will not add a term about which a contract is silent' " (*Dameron Hospital Assn. v. AAA Northern California, Nevada & Utah Ins. Exchange* (2014) 229 Cal.App.4th 549, 569).

In any event, there appear to be circumstances in which the exclusionary terms of section 3(G) could apply in a determination of "what constitutes the reasonable and customary value . . . under section 1300.71 (a)(3)(B), 28 Cal. Code of Reg." As Kaiser stated in its third motion in limine: "Since at least 2004, the DMHC has required all health plans to explain how they intend to pay for out-of-network emergency claims. Like other plans, Kaiser files its reimbursement methodology with the DMHC and, when revisions to that methodology are made from time to time, Kaiser files its revised methodology with the DMHC, as well. DMHC has the authority to take disciplinary actions, including by seeking civil, criminal, or administrative penalties if it finds a methodology is non-compliant." If Kaiser is correct in this interpretation, presumably section 3(G) could have some utility in such a disciplinary action. (See also *Prospect Medical Group, supra,* 45 Cal.4th at p. 507 [noting that "the Legislature has acted to protect the interests of noncontracting providers in reimbursement disputes by

24

prohibiting HMO's from engaging in unfair payment patterns involving unjust payment reductions, claim denials, and other unfair practices as defined, and by authorizing monetary and other penalties against HMO's that engage in these patterns"]; § 1371.37; see also § 1371.39 [authorizing providers to report HMO's that engage in "unfair payment pattern[s]" to the DMHC].) Pomona Valley Hospital observes that Kaiser itself might have cited the exclusion to excuse reimbursing lesser amounts in its initial payments under section 1300.71, subdivision (a)(3)(B) after terminating the 2004 Contract. The hospital also reasons that the exclusion could apply if Pomona Valley Hospital had attempted to bring an action directly premised on section 1300.71, subdivision (a)(3)(B) rather than one in quantum meruit. (See *Northbay Healthcare Grp. – Hosp. Div. v. Blue Shield of Cal. Life & Health Ins.* (N.D.Cal. 2018) 342 F.Supp. 3d 980, 986 [rejecting, 14 years after the 2004 Contract was executed, a Business & Professions Code § 17200 claim premised on the regulation's factors].)

Regardless, it is not this court's role to guess what limited circumstances the parties may have had in mind when agreeing to the exclusionary language of section 3(G). The point remains that there is no reason for this court to give the provision a broad reading—even more broad than a reasonable interpretation allows—just because it may have been poorly considered and drafted. Our role is simply to interpret the provision as it pertains to this case. Because the best interpretation of the provision is that it does not apply to the valuation required in a quantum meruit action, the trial court correctly decided the first motion in limine by allowing the terms of the 2004 Contract into evidence. The trial court's later determination in granting the new trial motion was therefore erroneous and must be reversed.

25

## II. The trial court's rulings relating to costs do not compel reversal

### A. *Relevant background*

Pomona Valley Hospital filed two motions in limine relating to costs of providing services. In its fourth motion in limine, it sought to exclude "costs or profits as evidence of the reasonable value of the services rendered." Citing to *Children's Hospital, supra,* 226 Cal.App.4th 1260, Pomona Valley Hospital argued that evidence of costs was not relevant to a quantum meruit fair market value determination, and that such evidence would unreasonably shift the jury's attention away from the value of services provided and toward the provider's costs. In a related motion in limine, its sixth, Pomona Valley Hospital argued in part that Kaiser's expert, Gustafson, should not be allowed to base his valuation on the hospital's costs because they were irrelevant to the fair market value of the services.

Kaiser opposed the motions. It argued that *Children's Hospital* only precluded introduction of service-specific costs, not overall costs. It further contended that Pomona Valley Hospital's overall costs were relevant to a fair market value determination. At oral argument on the matter, Kaiser agreed that the hospital's profits were not relevant but continued to argue against an exclusion of overall costs.

The trial court granted Pomona Valley Hospital's fourth motion in limine. The court's ruling stated: "The court grants the motion to preclude either party from producing evidence of the overall costs or profits of either Kaiser or Pomona." The ruling on the sixth motion directed the parties, in pertinent part, to "see" the ruling on the fourth motion, but also stated "the court denies the motion as it seeks to exclude Mr. Gustafson's value opinion because it relies upon incorrect and misleading data. This is the proper subject for cross-examination."

Despite the court's ruling on the fourth motion in limine, extensive evidence relating to Pomona Valley Hospital's costs was presented at trial. During opening argument, Kaiser presented a chart

comparing the increase in Pomona Valley Hospital's charges over time to the hospital services inflation rate, which Pomona Valley Hospital complained reflected operating costs. The trial court stated that the information in the chart was not something that it intended to exclude.

Later, the executive director of Kaiser's actuarial department, Michelle Abhasakun, testified about the methodology Kaiser used to determine reimbursement amounts paid to Pomona Valley Hospital following the termination of the 2004 Contract. Among other things, Abhasakun testified that "[t]he first thing that we look at is what we call the costs of the hospital" and "we want to make sure that we are paying them more than their costs." She continued that, after determining the hospital's costs, Kaiser applied "a multiplier," "[s]o we're not just trying to pay the hospital their exact costs. We try to make sure we are paying well more than their costs. . . . [I]f the hospital is like Pomona Valley and it's a trauma hospital, we double that ratio. . . . So let's say the hospital's cost-to-charge ratio was 10 percent, then in this prong we're doubling that and the result would be 20 percent." "We're going to try to pay them a hundred percent more than their costs." Abhasakun testified that Kaiser was "really confident" that its methodology was "reasonable and fair and that's because it kind of overshoots in a conservative way in a couple of places." She stated that Kaiser uses the higher result of two amounts it calculates, and "we're making sure that we're more than covering the hospital's costs. In fact, we target double the hospital's costs in the event it's a trauma hospital. And we're paying 20 percent more at least than what the hospital reports receiving from other payors." Abhasakun continued her testimony with several more references to Kaiser reimbursing Pomona Valley Hospital at an amount well in excess of its costs.

In sidebar discussions conducted during and after Abhasakun's testimony, Pomona Valley Hospital raised concerns that Abhasakun was testifying about costs in violation of the trial court's previous order

27

on its fourth motion in limine. The trial court declined to strike the testimony. Instead, it ruled that the jury could be instructed that the parties' experts' opinions were not based on Kaiser's methodology in determining the initial reimbursement amounts.

Pomona Valley Hospital for its part presented evidence that, according to Kaiser, "highlighted the significant expense of running a hospital." This included increasing resources required to run a trauma center, such as a helipad, trauma and plastic surgeons, specially-trained nurses, medical equipment, and additional facility construction.

Following the parties' presentation of evidence, the jury was instructed: " 'The evidence you heard about Kaiser's methodology serves only as background information about how Kaiser determined the fair market value of Pomona Valley Hospital's services. The parties' respective experts in this case are not relying on Kaiser's reimbursement methodology to determine the fair market value of the emergency medical services at issue.' " The trial court also instructed the jury, " 'You are not to consider either Pomona Valley Hospital's or Kaiser's costs or profits in determining the reasonable value of Pomona Valley Hospital's services.' " This latter instruction was submitted to the court by the parties jointly on a form that stated it was "requested by" both parties.

## B. *New trial motion*

Pertinent to our analysis here, in Kaiser's new trial motion it argued that the trial court improperly prevented it from presenting evidence relevant to Pomona Valley Hospital's operating costs. Kaiser contended that the court misapplied *Children's Hospital, supra,* 226 Cal.App.4th 1260 by excluding overall costs instead of a narrower set of costs, and that this ruling constituted an error in law. Kaiser averred that, absent the claimed error, it would have shown that Pomona Valley Hospital's billed charges increased at a rate greater than its costs, and that the ruling prevented Kaiser from rebutting any claim that Kaiser's reimbursements did not cover Pomona's costs. According

28

to Kaiser, if the evidence was allowed, Kaiser could have undermined two of the six different sets of rates Pomona Valley Hospital's expert Fritz relied on in opining on fair market value: the 86 percent rate from the 2004 Contract, and the rate Fritz obtained by applying a multiplier to the percentage paid by large health plans.

In opposition, Pomona Valley Hospital argued that the trial court's prior rulings were consistent with *Children's Hospital*, and that the trial court did not abuse its discretion in limiting evidence regarding costs. Pomona Valley Hospital additionally noted that, despite the trial court's rulings on the motions in limine, Kaiser was allowed to and did present evidence regarding the hospital's costs through Abhasakun's testimony.

The trial court rejected Kaiser's argument regarding costs. First, the court found that there was no error of law in the prior orders excluding costs evidence. Second, the court agreed with Pomona Valley Hospital that Kaiser was allowed to present certain costs evidence anyway.

**C.** *Analysis*

1. *The trial court properly acted within its broad discretion*

Kaiser argues that the trial court, in ruling that evidence of Pomona Valley Hospital's costs be excluded, misapplied *Children's Hospital*, *supra,* 226 Cal.App.4th 1260. According to Kaiser, while *Children's Hospital* found that certain types of costs evidence were irrelevant to a fair market value determination, the opinion did not purport to prohibit the presentation of evidence relating to overall costs. Kaiser asserts that the trial court's ruling was erroneous because it did prohibit such evidence.

Similar to this case, *Children's Hospital* concerned a dispute over the reasonable value of emergency medical services provided by a hospital. (226 Cal.App.4th at p. 1264.) A motion in limine that excluded certain cost information, relating to the hospital's service-

29

specific costs, was granted by the trial court. (*Id.* at p. 1277.) In reviewing the ruling, the appellate court found that this exclusion of costs evidence was correct. (*Id.* at p. 1268.) The court reasoned that "under quantum meruit, the costs of the services provided are not relevant to a determination of reasonable value. Quantum meruit measures the value of services to the recipient, not the costs to the provider." (*Id.* at p. 1278.) The court observed that, in disputes pertaining to attorney fees, "the courts have rejected a 'cost-plus' approach finding that basing the fee on costs is neither appropriate nor practical. [Citation.] 'Costs—high or low—can be subjective and if deemed relevant to value might reward inefficiency and greed.' " (*Ibid.*) The court continued, "the reasonable and practical way to value the . . . services provided by Hospital is to analyze what is being paid and accepted in the market. Parsing the costs for each service would be impractical. As pointed out by Hospital, a cost-based system 'would undermine efficiency and reward waste.' " (*Ibid.*)

To the extent that Kaiser argues that the trial court read too much into this holding of *Children's Hospital*, Kaiser appears to be correct. Although the trial court in this case made a number of statements relating to the exclusion of costs, and at one point said, "I've changed my opinion on this," the court's ruling on the fourth motion in limine stated that evidence relating to overall costs was precluded. While certain language in *Children's Hospital* could be viewed as applying to overall costs, the motion in limine at issue in that case targeted "service specific" costs. (226 Cal.App.4th 1260 at p. 1278.) Drawing a conclusion that *Children's Hospital* necessarily prohibits any evidence of a hospital's overall costs in any dispute relating to valuation of medical services is an overly broad reading of the opinion.

That said, it bears repeating that we review the trial court's ruling, not its reasoning. (*D'Amico, supra,* 11 Cal.3d at pp. 18–19.) Pomona Valley Hospital moved to exclude evidence of costs as being irrelevant, and the trial court expressed the view that such evidence

30

was not relevant to the fair market value determination required in this case. A trial court's discretion in determining the relevance of evidence is broad, and the court's exercise of discretion is reviewed for an abuse of discretion. (*Shaw v. County of Santa Cruz, supra*, 170 Cal.App.4th at p. 281.) "This is particularly so with respect to rulings that turn on the relevance of the proffered evidence. [Citation.] This standard is not met by merely arguing that a different ruling would have been better." (*Ibid*.)

We cannot say that the trial court abused its discretion in ruling that evidence of overall costs be excluded. Even if the trial court read certain aspects of the *Children's Hospital* decision too broadly, the principles expressed in the opinion supported the exclusion of overall costs evidence in this case. (See *Sanjiv Goel, M.D., Inc. v. Regal Medical Group, Inc., supra,* 11 Cal.App.5th at p. 1060, fn. 3 ["the decision in *Children's Hospital* leaves considerable discretion to trial courts to determine what billing and payment evidence might be relevant to a particular case"].) As *Children's Hospital* observed, the proper determination in a quantum meruit action is "the value of services to the recipient, not the costs to the provider." (226 Cal.App.4th at p. 1278.) Valuation of services generally considers "what is being paid and accepted in the market." (*Ibid*.) Consideration of costs, including overall costs, can " 'undermine efficiency and reward waste.' " (See *ibid*.)

Consideration of what a willing buyer would pay to a willing seller in this case did not require evidence of overall costs. In fact, if a valuation were based on a percentage of costs, that could reward waste and inefficiencies since higher costs would inevitably result in higher amounts of reimbursement. The trial court properly acted within its discretion in effectively ruling that evidence of costs should be excluded as irrelevant.

In a related argument, Kaiser asserts that its expert, Gustafson, should have been allowed to testify that Pomona Valley Hospital's total

31

billed charges increased at a rate greater than its total operating expenses (or costs), which, according to Kaiser, would have demonstrated that the 86 percent rate in the 2004 Contract had become untenable.  Exclusion of this evidence was a matter squarely within the trial court's discretion.  Testimony relating to such evidence likely would have strayed into the type of costs evidence that *Children's Hospital* expressly found inadmissible—"[p]arsing the costs for each service" (226 Cal.App.4th at p. 1278)—and  certainly could have confused the jury.[5]  The testimony could have led the jury to speculate that the hospital's overall charges and costs were directly correlated with emergency charges and costs, and that emergency service charges outstripped emergency service costs at the same rate as overall costs.  Such speculation on the part of the jury would have been detrimental to its ultimate task of determining a fair market value for the emergency services at issue.  Accordingly, the trial court did not abuse its discretion in excluding the testimony.

2. *In any event, Kaiser fails to show prejudice*

As noted, following trial, in rejecting Kaiser's argument that a new trial was warranted due to the exclusion of costs evidence, the trial court observed that, despite the prior ruling, Kaiser was allowed to present costs evidence anyway.  Implicit in this ruling was a finding that Kaiser was not prejudiced by the trial court's intended preclusion of costs evidence.

Even when legal error is established on a motion for new trial, "[t]o be entitled to a new trial, the moving party must also show the error was prejudicial—that it affected a substantial right and prevented him from obtaining a fair trial.  [Citation.]  We may not

---

[5] Gustafson did testify that the amount Kaiser previously paid Pomona Valley Hospital under the terminated 2004 Contract increased at a rate "much faster than the price of hospital services generally"— 8.4 percent compared to 4.6 percent.

substitute our judgment for the trial court's on the essentially factual question of whether the legal error was prejudicial, and we will reverse only on a strong showing of abuse of discretion." (*Donlen, supra,* 217 Cal.App.4th at p. 147.) We discern no abuse of discretion in the trial court's implicit finding that the purported exclusion of costs evidence did not result in the trial being unfair to Kaiser.

Kaiser argues that, based on the trial court's order regarding costs, its expert Gustafson was prevented from presenting testimony that "Kaiser covered [Pomona Valley Hospital's] fixed costs even without steerage, which undermined [the hospital's] justification for charging Kaiser higher rates than in-network plans." This argument ignores the extensive testimony regarding costs given by Abhasakun. Again, Abhasakun testified, among other things, "[W]e want to make sure that we are paying them more than their costs," "[w]e're going to try to pay them a hundred percent more than their costs," and "we're making sure that we're more than covering the hospital's costs." Abhasakun repeatedly emphasized in her testimony that Kaiser's reimbursements covered Pomona Valley Hospital's costs. Further testimony on the matter would have simply been redundant, and it is not reasonably probable that it would have led to a different verdict.

Kaiser further asserts that the trial court erred in instructing the jury, "You are not to consider either Pomona Valley Hospital's or Kaiser's costs or profits in determining the reasonable value of Pomona Valley Hospital's services." As explained, the trial court acted within its discretion in excluding evidence of costs, and Kaiser agreed with the court's exclusion of profits. Even if there were possible error in the instruction, however, it would not warrant reversal.

"A judgment may not be reversed on appeal, even for error involving 'misdirection of the jury,' unless 'after an examination of the entire cause, including the evidence,' it appears the error caused a 'miscarriage of justice.'" (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574 (*Soule*), quoting Cal. Const., art. VI, § 13.)

" 'Instructional error in a civil case is prejudicial " '[w]here it seems probable' " that the error prejudicially affected the verdict. [Citation.] It is not enough that there may have been a "mere possibility" of prejudice.' " (*Alcala v. Vazmar Corp.* (2008) 167 Cal.App.4th 747, 755 (*Alcala*).)

We first note that the instruction Kaiser complains about was requested by both Kaiser and Pomona Valley Hospital. Kaiser argues that it was simply following the ruling previously made by the trial court and that it had no choice but to acquiesce to the jury instruction. The record demonstrates, however, that the trial court did not take a strict line at trial on the preclusion of costs and allowed a significant amount of evidence pertaining to costs despite its initial ruling. Rather than simply requesting a jury instruction precluding consideration of costs, Kaiser could have requested clarification, particularly because Kaiser agreed that at least some consideration of costs was inappropriate. Where a " 'court gives an instruction correct in law, but the party complains that it is too general, lacks clarity, or is incomplete, he must request *the additional or qualifying instruction in order to have the error reviewed.*" ' " (*Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1131.)

In any event, it is not probable that Kaiser suffered undue prejudice from the instruction. In its opening brief, Kaiser characterizes Pomona Valley Hospital's case at trial as centered on three themes: the 2004 Contract, the "costs of running a hospital," and "the role of steerage." The latter two of these themes, according to Kaiser, expressly involved consideration of the hospital's costs. Kaiser references Pomona Valley Hospital's opening statement, in which Kaiser asserts it "emphasized the significant expense of running its hospital." Kaiser also argues that witnesses called by Pomona Valley Hospital "highlighted the significant expense of running a hospital." And Kaiser contends that Pomona Valley Hospital's presentation of evidence relating to steerage was premised on the hospital's "overall

34

operating costs," "on the theory that high volumes of patients allow hospitals to lower the average cost per patient and more easily offset fixed costs."

Thus, if Kaiser was correct that the jury instruction was erroneous, the error was at least as likely to have prejudiced Pomona Valley Hospital as Kaiser. Under Kaiser's theory, due to the instruction, the jury would have had to disregard the significant expenses of running the hospital and many of the claimed benefits the hospital received due to steerage. Accordingly, even assuming the instruction was erroneous, Kaiser cannot demonstrate that it was reasonably probable it would have obtained a more favorable verdict had the instruction not been given. (See *Soule, supra,* 8 Cal.4th at p. 574; *Alcala, supra,* 167 Cal.App.4th at p. 755.) The asserted error did not unfairly skew the verdict against Kaiser.

## III. The expert testimony was proper

Kaiser next argues that the testimony of Pomona Valley Hospital's expert, Fritz, was improper and that the trial court's admission of the testimony prejudiced Kaiser. Kaiser asserts that Fritz's valuation relied on data that did not reflect the actual market rates for emergency services, and that the valuation rested on unfounded conjectures.

The basis for Kaiser's complaint is Fritz's reliance on one of six sets of rates he considered in valuing the emergency services provided: his analysis of the rates paid to Pomona Valley Hospital under in-network contracts with "the big six" plans. Kaiser does not contend that these rates should have been excluded as part of a proper fair market valuation. Rather, Kaiser disputes Fritz's conclusion that a multiplier was required when evaluating these rates because they were dissimilar from the valuation considerations relevant to reimbursement by an out-of-network, uncontracted payor like Kaiser.

As explained previously, Fritz opined that, in valuing the emergency services at issue in this case, simply factoring in the actual,

35

relatively low rates paid by the big six was not conducive to determining reasonable value because it did not account for the benefits the hospital received through steerage. Fritz thus assigned a multiplier to the rates paid by the big six to "make them more comparable to the out-of-network claims that are at issue in this dispute," and calculated a weighted average rate of 75 percent for this factor. This number was slightly below his ultimate opinion that, when considering all six factors, the fair market value of emergency services provided to Kaiser members was 77.5 percent of the total billed charges.

The trial court allowed Fritz's testimony, noting in its ruling on Kaiser's pertinent motion in limine that Kaiser's concerns were "the proper subject of cross-examination." We review the trial court's ruling admitting the expert testimony for an abuse of discretion. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 (*Sargon*).) We find no abuse of discretion here.

Kaiser seems to assert that, whenever an expert opines on valuation, the expert must avoid projections or adjustments, and may only base his or her opinion on concrete numbers alone. That is not the role of a valuation expert. Assumptions of some sort are likely to be necessary whenever an expert is tasked with opining on fair market value. The methodology used to arrive at a valuation depends on the particular circumstances of a case. (See *People ex rel. Dept. of Transportation v. Presidio Performing Arts Foundation* (2016) 5 Cal.App.5th 190, 206, fn. 7.) " 'Valuation methods will differ with the nature of the business or practice and with the purpose for which the evaluation is conducted.' " (*Id.* at p. 210.)

In a case like this one involving the valuation of emergency medical services, "a determination of fair market value is necessarily hypothetical." (*Long Beach Memorial, supra,* 71 Cal.App.5th at p. 346.) Parties' "prior *actual* transactions are not dipositive," and a " 'wide variety of evidence' " is properly considered. (*Ibid.*) The jury has

36

discretion to reject transactions that it determines are not representative of the reimbursement obligations at issue in the case, and to give greater weight to transactions that it views as more analogous.  (*Id.* at p. 346.)

Certainly, in a case such as this one, an expert's valuation must be grounded in relevant market figures and may not rely on "a leap of logic or conjecture."  (*Sargon, supra*, 55 Cal.4th at p. 772.)  Nor can an expert rely on unfounded methodology.  (*People ex rel. Dept. of Transportation v. Dry Canyon Enterprises, LLC* (2012) 211 Cal.App.4th 486, 495.)

Fritz's testimony, however, did not run afoul of these principles.  As made clear during the testimony, his evaluation of the rates paid by the big six insurers did consider the actual rates paid.  Fritz informed the jury what those rates were.  He then explained his reasons for applying a multiplier to the rates.

Fritz offered a rational basis for applying the multiplier.  He explained the benefits of steerage and why a hospital would accept less from an in-network plan.  He testified that hospitals discount emergency services in exchange for a health plan's agreement to pay for elective services, that in-network plans advertise the hospital for elective services, and that scheduled surgeries allow the hospital to do advance planning through diagnostics and by ensuring the required staff is present.  He further explained that in-network contracts assist hospitals in attracting physicians, who can surmise that there will be a sufficient number of patients to maintain a practice at the hospital.

This testimony was not inconsistent with legal authority.  As *Long Beach Memorial* recognized, transactions grounded in contracts will have lower rates than "the higher rates charged and accepted where no contract exists." (71 Cal.App.5th at p. 341; see also *HCA Health Services of Georgia, Inc. v. Employers Health Insurance Company* (11th Cir. 2001) 240 F.3d 982, 997, fn. 29 [noting that

"[w]ithout the benefit of steerage" there was "no reason" for a medical center "to agree to discount its fees"].)

Kaiser additionally argues that the multiplier chosen by Fritz in evaluating in-network rates was arbitrary. Fritz gave concrete reasons for choosing the multiplier that he used, however, which rested on actual rates paid for reimbursement of medical services. He testified regarding payments made to a specific hospital frequented by two types of Kaiser members, those under a "directed" or "steered" plan, and those under a "self-directed" plan. The rate paid by Kaiser for the self-directed members was substantially higher than the rate for the directed ones, by an amount significantly greater than the multiplier used by Fritz. Fritz further testified concerning other market data that supported his chosen multiplier. Moreover, the rate calculated by application of the multiplier was similar to other out-of-network rates in the six factors ultimately relied upon by Fritz.

In this case, there was no single method of determining a reasonable fair market value of the services provided. Fritz's methodology sufficiently considered actual transactions and relevant market dynamics.

As noted by the trial court, Kaiser was able to cross-examine Fritz regarding his methodology. Kaiser availed itself of this opportunity, cross-examining Fritz at length regarding the factors he considered and the adjustments he made. Additionally, Kaiser's expert, Gustafson, criticized Fritz's valuation, stating, among other things, that "it doesn't pass the smell test" and saying, "[H]e's wrong."

The jury was free to credit Fritz's opinion or discredit it as it saw fit. In the end, the jury apparently believed Fritz. That was a matter within the jury's discretion and a determination we have no cause to reverse.

## IV. Prejudgment interest should have been awarded at a rate of 7 percent

Finally, Kaiser argues that the trial court erred in awarding Pomona Valley Hospital prejudgment interest at a rate of 10 percent rather than 7 percent. We agree.

Following trial, the court found that Pomona Valley Hospital was entitled to prejudgment interest pursuant to Civil Code section 3287, subdivision (b) because the action was "based on a cause of action in contract where the claim was unliquidated." In light of that conclusion, the court determined that an interest rate of 10 percent was warranted under Civil Code section 3289, subdivision (b), which provides that if "a contract . . . does not stipulate a legal rate of interest, the obligation shall bear interest at a rate of 10 percent per annum after a breach."

The trial court erred in concluding that the 10 percent interest rate provided for under Civil Code section 3289, subdivision (b) applied simply because prejudgment interest was awardable under Civil Code section 3287, subdivision (b). Article XV, section 1 of the California Constitution provides that unless the parties "contract in writing for a rate of interest," the "rate of interest upon the loan or forbearance of any money, goods, or things in action, or on accounts after demand, shall be 7 percent per annum." Civil Code "[s]ection 3289 provides rules for interest rates applicable to breaches of contract. If the contract specifies a legal rate of interest, a court will apply that rate 'after a breach [of contract] . . . until the contract be superseded by a verdict or other new obligation.' ([Civ. Code,] § 3289, subd. (a).) If a contract does not stipulate a legal rate of interest, a 10 percent per annum interest rate applies in the event of a breach. (*Id.*, subd. (b).)" (*Carmel Development Co., Inc. v. Anderson* (2020) 48 Cal.App.5th 492, 525–526 (*Carmel Development*).)

Quantum meruit is considered an action in contract under Civil Code section 3287, subdivision (b). (*George v. Double-D Foods, Inc.* (1984) 155 Cal.App.3d 36, 47 (*George*).) It does not follow, however,

that, simply because this matter meets the definition of an action in contract, Pomona Valley Hospital is entitled to 10 percent prejudgment interest. While Civil Code "section 3287[, subdivision] (b) applies broadly to any cause of action in contract," "section 3289 applies only to *breach* of contract actions." (*Carmel Development, supra,* 48 Cal.App.5th at p. 527.) Civil Code sections 3287 and 3289 are thus reconcilable—a claim may be for a cause of action in contract but not for breach of contract. (*Carmel Development*, at p. 527.) It is evident that the instant action in quantum meruit, although an action in contract, is not an action for *breach* of contract. The proper rate of prejudgment interest is therefore 7 percent.

Pomona Valley Hospital argues that a 10 percent interest rate is appropriate under *George, supra,* 155 Cal.App.3d 36 and *Zalk v. General Exploration Co.* (1980) 105 Cal.App.3d 786. Neither case, however, discussed the proper rate of interest awardable under Civil Code section 3289. Instead, both cases simply found that prejudgment interest was available in a quantum meruit action under section 3287, subdivision (b). (See *George* at pp. 46–47; *Zalk* at pp. 794–795 [noting, in dicta, that the trial court erred by failing to award prejudgment interest on a claim in quantum meruit].) There is no dispute in this appeal as to whether prejudgment interest could be awarded. Rather, the dispute concerns the amount of prejudgment interest. Because this action was in quantum meruit, not one for breach of contract, the trial court could only award prejudgment interest at a rate of 7 percent. (See *Carmel Development, supra,* 48 Cal.App.5th at p. 527.)

40

## DISPOSITION

The order of April 12, 2024 conditionally granting the new trial motion is reversed, and the amended judgment entered May 7, 2024, is vacated.  The matter is remanded to the trial court with directions to enter judgment consistent with the jury's verdict and the initial judgment of January 31, 2024, except that prejudgment interest shall be awarded at a rate of 7 percent.

Pomona Valley Hospital is entitled to its costs on appeal.


LUI, P. J.

We concur:


RICHARDSON, J.


GILBERT, J.*

---

**\*** Retired Presiding Justice of the Court of Appeal, Second Appellate District, Division Six, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 3/12/26

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| POMONA VALLEY HOSPITAL MEDICAL CENTER, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> KAISER FOUNDATION HEALTH PLAN, INC., <br><br> Defendant and Appellant. | B337963, B339448 <br><br> (Los Angeles County Super. Ct. No. KC069796) <br><br> ORDER CERTIFYING OPINION FOR PUBLICATION |

The opinion in the above-entitled matter filed on February 27, 2026, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports, and it is so ordered.

LUI, P. J.